60 So.2d 747 (1952)
STATE
v.
FLORIDA STATE IMPROVEMENT COMMISSION.
Supreme Court of Florida, en Banc.
October 17, 1952.
*748 William D. Hopkins, Tallahassee, and A.K. Black, Lake City, for appellant.
J. Turner Butler, Jacksonville, and Ford L. Thompson, Tallahassee, for appellee.
MATHEWS, Justice.
This appeal is from a final decree validating bonds proposed to be issued by the Florida State Improvement Commission, the proceeds of which are to be used in financing the construction of a hospital in Madison County, Florida.
Chapter 27689 created the Madison County Health and Hospital Board, and combined and coordinated in such board all preventive public health activities of the county and health departments of all the cities and towns of the county; full and comprehensive powers were granted said Board to carry out the intent and purpose of the act; for the execution of the health program, the act distributed to the Madison County Health and Hospital Board the first $12,500 of the race track funds allocated to Madison County under the provisions of Chapter 550, Florida Statutes, F.S.A., of which sum $10,000 was allocated to the retirement of the principal and interest of the bonds provided for in the act and $2,500 allocated for the operation of the health and hospital program provided for by the act; in addition thereto, in the event the race track funds should fail or should for any reason become insufficient, the Board of County Commissioners were authorized to levy an ad valorem tax of not more than three (3) mills, the receipts from such levy to be paid to the State Treasurer of the State of Florida to the credit of the State Board of Health for the account of the Madison County Health and Hospital Board, to be expended by said Board in Madison County solely for the purpose of carrying out the object and intent of the act; provides the Madison County Health and Hospital Board and the Florida State Improvement Commission, jointly and severally, shall have complete powers and authority to issue bonds for the purpose of financing the cost of erection, completion and outfitting of a county health and hospital building; provides that the Improvement Commission upon the request of the Health and Hospital Board, may conduct such plan to conclusion and that "whenever required or found expedient by the Florida State Improvement Commission it is hereby authorized to take securities, assurances and finances of and from the Madison County Health and Hospital Board and the latter is hereby authorized to give such securities, assurances and finances, or rights, title and property in order to effectuate the purposes of this act"; authorizes the Madison County Health and Hospital Board to convey to the Improvement Commission absolute title to the land and health building to be constructed, the same to be reconveyed when the cost of such building or land has been paid.
The proceedings, resolutions and acts of Madison County Health and Hospital Board, the Florida State Improvement Commission and the Board of County Commissioners of Madison County have been taken in accordance with the provisions of Chapter 27689, Laws of Florida, Acts of 1951. The Health Unit has conveyed to the Florida State Improvement Commission certain real estate in Madison County. The total cost of the project is to be $325,000. The Improvement Commission proposes to issue bonds in the amount of $120,000. These bonds are to be in denomination of $1,000 each, maturing in numbered groups beginning February 1, 1953, and on the same date each year thereafter to and including February 1, 1968. It is contemplated that the principal and interest of the bonds will be fully paid and retired within a period of fifteen years. The principal and interest of the bonds are to be retired *749 from so-called rentals to be paid to the State Improvement Commission by the Madison County Health and Hospital Board. The revenue with which Madison County will pay the semiannual requirements for principal and interest is to come from $10,000 of race track funds allocated to Madison County and if the race track funds so allocated should fail or become insufficient, then an ad valorem levy not to exceed three mills is required. Upon retirement of all the bonds including any refunds thereof, the property is then to be reconveyed by the State Improvement Commission to the Madison County Health and Hospital Board. Subsection 4 of Section 8 of Chapter 27689 is as follows:
"(4) If the provision herein made for the payment from the race track funds allocated to Madison County of the bonds herein authorized should fail or should for any reason become inadequate, then in that event, the principal and interest on the bonds herein authorized shall be payable from the proceeds of the ad valorem tax provided for under the provisions of this act. If the provision herein made for the payment of the principal and interest of the bonds herein authorized from race track funds should at any time fail or become inadequate, it shall also become the mandatory duty of the Board of County Commissioners of Madison County to levy a tax adequate to pay such principal and interest on said bonds of not more than three mills on all taxable real and personal property in said county, and such mandatory duty may be enforced by mandamus or any other appropriate remedy." (Emphasis supplied.)
Section 17 of Chapter 27689 is as follows:
"Section 17. For the purpose of carrying out the provisions of this act for the fiscal year beginning July 1, 1951, and for a period of twenty-five (25) years thereafter there shall be a levy and distribution in the manner provided for in Section 7 of this act."
The real question to be decided in this case is: In the event the race track funds allocated by Chapter 27689, Laws of Florida, Special Acts of 1951, fail or become insufficient, does the commitment of Madison County to levy, without an approving vote of the majority of the freeholders, sufficient millage not to exceed three mills to pay lease rental required offend the provisions of Section 6 of Article IX of the Florida Constitution, F.S.A.?
The above question concerns the erection and equipment of a county hospital and not a county jail or courthouse. A county jail or courthouse stands in a different class from any other county building or any other county undertaking. The erection of a county jail or courthouse serves not only a county purpose, but it is an absolute and indispensable county necessity. A county government could not exist without a county jail and a courthouse. The enforcement of the laws is vital and necessary in order for a county government to exist. Persons charged with such crimes as murder, rape, arson, burglary and other felonies could not be incarcerated and detained without the existence of a county jail, whether erected and constructed by the county or rented by the county. Without jails or places of detention and incarceration, we would have confusion, disorder, chaos and anarchy. A courthouse is likewise an absolute and indispensable county necessity, in addition to being for a county purpose. The Constitution provides for a county judge, a sheriff, a county clerk, tax assessor, a tax collector and a county board of county commissioners. These officers are necessary and indispensable to the operation of a county government. Mortgage and deed records and the records of the Court as well as the records of the County Judge's office, which has jurisdiction of the administration of estates and the probation of wills, must be preserved and the courthouse is the place where they are preserved.
Private individuals, associations or institutions may construct playgrounds, parks, hospitals or other public places which could also be constructed by a county as serving a county purpose. Private individuals, associations and institutions are not expected to construct county jails or county courthouses. They have no use for such buildings. They have no right or authority to *750 incarcerate and detain those charged with the commission of crimes. They are not authorized and it is not their duty to provide a courthouse to house county officials and to preserve vital county records.
The appellee strongly urges that the cases of Posey v. Wakulla County, 148 Fla. 115, 3 So.2d 799, and Tapers v. Pichard, 124 Fla. 549, 169 So. 39, are decisive on this question. These cases relate to courthouses or jails and not to hospitals. They relate to buildings which are absolute and indispensable county necessities. In the case of Posey v. Wakulla County, supra [148 Fla. 115, 3 So.2d 801], this Court said:
"The construction of a county courthouse is an essential governmental requirement of the county and certificates of indebtedness for that purpose payable from budgetary requirements in due course of law do not require an approving vote of the freeholders." (Emphasis supplied.)
In the case of Tapers v. Pichard, supra [124 Fla. 549, 169 So. 40], this Court said:
"Contracts let in contemplation of this act are limited to county necessities under strict budgetary regulations. The county could wait until the tax collecting period (not exceeding five years) expired and the taxes collected and then proceed to construct the courthouse or jail, but in lieu of this, if it becomes necessary to commence construction earlier and pay for it from the funds as they are collected, no law is violated." (Emphasis supplied.)
The appellee also relies upon the case of State v. Florida State Improvement Commission, Fla., 48 So.2d 165, 167. In an opinion in that case the Court said:
"* * * Current governmental needs as contemplated by Tapers v. Pichard arise from authority of Section 135.01, F.S.A. It has reference to the courthouse, jail or any county building with equipment essential to the proper administration of county government. Administering the public school program, the highway program, keeping the peace, assessing and collecting taxes, old age compensation, looking after the poor and the indigent, juvenile delinquents and holding elections are among the functions brought within its compass. The public health may be included in this catalogue of functions and the legislature may include others. When they become so numerous that they require additional housing space it may be provided in the manner approved in Tapers v. Pichard. If the morals of the country become so perverse that the jail needs enlarging, that may be accomplished in the same way."
The language above quoted was not essential to a decision in that case and is obiter dicta. It is not controlling in this case.
Prior to the adoption of the amended Section 6 of Article IX of the State Constitution, bonds could be issued for any county purpose and without the vote of the freeholders or the people of the county if properly authorized by the Legislature. Bonds could be issued for a highway program, including the purchase or condemnation of rights-of-way, the building of roads and bridges, buildings to care for the poor and indigent, juvenile delinquents, the acquisition and improvement of land for public parks, recreation centers, waterworks systems, electric light systems, and ad valorem taxes levied and collected to pay the principal and interest on such bonds. The only acts necessary for the issuance of such bonds and the levy and collection of ad valorem taxes were to have a delegation in the Legislature from the county who would put through a special act and a board of county commissioners of a county who would perform under the Act and then bonds could be issued and ad valorem taxes levied without any vote of the freeholders or the people who had to pay the bill.
It does not appear that amended Section 6 of Article IX requires any interpretation. The language is simple, plain and unambiguous. If, however, any interpretation or construction is necessary in order to determine the purpose of the Legislature in proposing this amendment and of the people in adopting the same, it is a cardinal principle of constitutional law that we may resort to the history of the *751 times in order to determine the evil sought to be remedied and the purpose to be accomplished.
Many of us lived through the times immediately prior to the adoption of the amended Section 6 of Article IX of the State Constitution, and are thoroughly familiar with the conditions and the history of the times which resulted in a demand on the part of the people for this amendment.
Hundreds of millions of dollars in bonds had been issued by municipalities and counties throughout the state. These bonds were issued pursuant to hundreds of special acts of the Legislature. These acts were passed by the Legislature as local bills and without the approval of anyone except the delegation in the Legislature from the county affected. Under these various acts, ad valorem taxes were levied and the future credit of the governmental unit pledged without the approving voice of the freeholders or the people who had to pay the taxes. Most of these bonds were issued during the period known as the "Boom Days". The "Boom" burst  a depression was on and the people and the freeholders found themselves saddled with debts impossible for them to pay. Millions of these bonds sold for less than 20% of par and some of them for less than 10% of par. Defaults multiplied throughout the state. The effect was as could be expected. The people awakened to the fact not only that an intolerable burden had been placed upon them far beyond their ability to pay, but also that the very welfare of the State was threatened, because of the weakened credit structure. Indeed, such was the impact that even the Congress of the United States took cognizance of the financial condition of Florida municipalities and amended the Federal Bankruptcy Act, 11 U.S.C.A. § 1 et seq., so as to bring bankrupt municipalities within its terms. Many Florida cities and towns took advantage of this amended act.
It was during such times and under these conditions that the Legislature of 1929, in response to the demands of the people, adopted the proposal to amend Section 6 of Article IX of the Constitution. In the ensuing general election the proposed amendment was adopted. There are no exceptions in the amendment. Had the Legislature desired to make exceptions, it had a perfect right to do so. It could have provided that hospitals, playgrounds, recreation centers, acquisition of rights-of-way for road and bridge purposes, or the construction of roads and bridges, should be excepted, whenever the Legislature determined that such things were indispensable or necessary to enable the county governments to function. But the Legislature made no such exception. Had it done so, amended Section 6 of Article IX would have been an empty gesture, because in order to issue county bonds for any purpose, it would only have been necessary to pass a special act declaring that the purpose was indispensable or necessary to the existence of a county government.
It has never been difficult for a local delegation to put through a special law declaring that a particular undertaking constituted a municipal or county purpose and it would not be difficult for such a delegation to have enacted a special law declaring a particular undertaking to be indispensable and necessary to the county government. In local bills the Legislature would not hesitate to declare that "black was white" for a certain purpose, or to declare that "salt water is fresh", which has been done by the Legislature.
The case of State v. Florida State Improvement Commission, Fla., 48 So.2d 165, was decided on October 24, 1950. On December 2, 1949, this Court rendered an opinion in the case of Yon v. Orange County, Fla., 43 So.2d 177. There was involved in this case the acquisition of a right-of-way for a public road in Orange County and the issuance of bonds, the principal and interest of which was to be paid by ad valorem taxes. This was one of the very things which the part of the opinion quoted in the case of State v. Florida State Improvement Commission, Fla., 48 So.2d 165, said might eventually be brought within the compass of Section 135.01 with reference to jails and courthouses, when the Legislature saw fit to include it and put it on the same basis as a courthouse or jail. However, in the case of Yon v. Orange County, supra [43 So.2d 179], *752 the Court clearly pointed out the distinction between the jail and courthouse cases and the question of issuing bonds, the principal and interest of which was to be paid from the proceeds of ad valorem taxes levied and pledged over a period of years, and then said:
"It is our conclusion that the portions of Section 2 of Chapter 26080, supra, authorizing a levy of an ad valorem tax on all the taxable property of Orange County, Florida, and the proceeds thereof used to finance certificates of indebtedness issued by the Board for the purchase of rights of way of State Road No. 50 is violative of Section 6 of Article IX of the Constitution of Florida and therefore unenforceable, in the absence of an approving vote of the freeholders of the County, in accordance with the mandatory requirements of such constitutional provision. Hence, it follows that the bill of complaint is not wholly without equity and that the decree appealed from should be reversed."
It is, therefore, apparent that although the Court did say in the quoted language from the case of State v. Florida State Improvement Commission, Fla., 48 So.2d 165, that a highway program may be included within the compass of Section 135.01, F.S.A., relating to a county courthouse and jail, when the Legislature saw fit to act, the Court had just refused to apply such doctrine in the case of Yon v. Orange County, supra. We are now called upon to apply this doctrine and to extend the doctrine of Tapers v. Pichard, supra, and Posey v. Wakulla County, supra, to a county hospital; in other words, to say that a county hospital is a current governmental need, and hence, like a courthouse or jail, essential to the administration of county government. There is no similarity between the purpose to be served by a courthouse or a jail and that to be served by a county hospital. There can be no doubt that a county hospital serves a county purpose just as the acquisition of a right-of-way for a road or a bridge or the construction of a road or bridge will serve a county purpose. But that is not decisive of the question before us.
From the very beginning of our state government practically all of the counties of the state have maintained and operated a county government without a county hospital and when county hospitals were constructed or erected this was done either from taxes levied in a particular year and an appropriation set forth in the budget for that particular year or by the issuance of bonds, the principal and interest of which was to be paid by ad valorem taxes, and after the same had been approved in an election or after the same had been authorized by some special act enacted by the Legislature at the request of the local delegation from the county affected. Hospitals, unlike county jails, have been erected and maintained throughout the centuries by private individuals, institutions and associations. Although a county hospital will serve a county purpose it does not follow that it is a "current governmental need, and like a courthouse or jail, essential to the administration of the county government."
In the case of Seaboard Air Line R. Co. v. Peters, Fla., 43 So.2d 448, 455, decided on December 23, 1949, the opinion was written by the late Mr. Justice Chapman. Mr. Justice Sebring, now the Chief Justice, did not participate. Mr. Justice Thomas dissented. Mr. Justice Hobson wrote a special concurring opinion which was concurred in by Mr. Justice Roberts reading as follows:
"I concur in the opinion prepared by Mr. Justice Chapman but in doing so I do not wish to be understood as unqualifiedly approving a holding to the effect that whenever the legislature declares any given project or undertaking to be a county purpose, such declaration is the conclusive equivalent of a judicial determination that such project or undertaking is `an essential governmental requirement of the county.' * * *
"It is my opinion, however, that present existing conditions in Dade County, Florida, which are the result of modernity and its continued march of progress implemented immeasurably by *753 the enthusiasm, energy and foresightedness of its citizens, compel the conclusion that the airport in question is a county necessity. See Tapers v. Pichard, 124 Fla. 549, 169 So. 39.
"The economic stability of Dade County and the general welfare of not only its residents but as well that of the people of this State and Nation depend in a real and vital sense upon the continuation and expansion of the Miami International Airport. In the light of such circumstance the legislative declaration to the effect that an airport situated as is the Miami International Airport constitutes a project which is a county purpose is completely justified. Indeed, this Court is warranted in holding said airport to be `an essential governmental requirement' of Dade County. I, by no means, intend to say that an airport of this character is an essential requirement of government in any other county of this State and more particularly in any small or rural county. It is necessary in this case only to determine whether the maintenance and improvement of this airport is an essential government requirement of Dade County. The courts will decide whether an airport in any other county of Florida is an essential governmental requirement when faced with that question.
"With the foregoing explanation, I concur in the opinion prepared by Mr. Justice Chapman."
Mr. Justice Terrell also wrote a special concurring opinion which was concurred in by the then Mr. Chief Justice Adams, in which it was said:
"In Leon County v. State, 122 Fla. 505, 165 So. 666; Tapers v. Pichard et al., 124 Fla. 549, 169 So. 39; and Posey v. Wakulla County, 148 Fla. 115, 3 So.2d 799, we approved the doctrine that Section Six of Article Nine of the Constitution was not designed to hamstring public officials in providing for current governmental necessities when done under authorized budgetary requirements. The primary purpose of Section Six of Article Nine was to restrain and discourage spendthrift tendencies of political entities to borrow from the future to satisfy present desires, in other words, to prevent the present generation from taking a hay ride at the expense of its children and grandchildren. Present necessities of government are not in this class and I would not approve any project not shown to be a current governmental necessity.
"I think the record in this case shows a clear purpose on the part of the administration of Miami International Airport to improve and enlarge its facilities to protect the safety of the public and otherwise meet the obligations imposed on it by law. I think the law defining its powers requires that these things be done under essential budgetary requirements and I think the ends to be accomplished are well within the cases cited in the preceding paragraph.
"The responsibility to provide the means to carry on current governmental necessities devolves on the legislature. It has a responsibility to observe constitutional limitations in doing this no less pressing than that imposed on this Court. The means provided should not be stricken down unless clearly shown to be in violation of the Constitution. So far as we are advised the circumstances of the instant case are without a parallel in this country and these unique circumstances afford a basis to uphold it without doing violence to Section Six, Article Nine or any other provision of the Constitution."
It thus appears that the majority of the Court made a clear distinction between a "governmental purpose" and a "governmental necessity."
To extend the doctrine of Section 135.01, F.S.A., as construed by this Court in the case of Posey v. Wakulla County, supra, and Tapers v. Pichard, supra, to include a hospital, and eventually, parks, playgrounds, recreation centers, rights-of-way for roads and bridges, the construction of roads and bridges, and any other undertaking which will serve a county purpose, *754 would mean the absolute repeal of Amended Section 6 of Article IX of the State Constitution. The Constitution itself provides for the method for its amendment, modification, or repeal of any particular section. It cannot be modified, amended or repealed in any particular by legislative fiat, executive usurpation, or judicial interpretation or construction. If there is to be modification, amendment, or repeal, it must be in the manner and method provided for in the fundamental law itself.
In this case the Act in question and the proceedings had thereunder are rather involved and adopt the Florida State Improvement Commission as one of the instrumentalities to carry out the scheme. The agreement in question is sometimes referred to as a "lease-purchase agreement". The physical assets and property owned by Madison County are to be transferred to the Florida State Improvement Commission and subsequently are to be re-transferred or reconveyed, when, as and if the interest and principal of the bonds have been paid in full. The amount of ad valorem taxes which the county is mandatorily required to pay is called "rental", but the proceeds are to be used solely and exclusively for the payment of the interest and principal of the bonds.
It, therefore, appears that whatever the name, or whatever the scheme may be called, the proceeds of the principal and interest of the ad valorem taxes are to go directly from the pockets of the ad valorem taxpayers to that of the holders of the bonds, for the purpose of paying in part the principal or interest of such bonds, in as straight a line as a "Martin flies to his gourd".
The land and physical property of the county is sought to be conveyed to the Florida State Improvement Commission by deed as a part of this transaction. This property is to be reconveyed to Madison County Health and Hospital Board when, as and if the principal and interest of the bonds are ever paid. This conveyance is a pledge, or a mortgage, it matters not what the name may be. The pledging of such property to secure a debt is prohibited. There is a vast difference between the pledging of property to secure a debt whereby the property itself may be lost entirely to the county, and the mere pledging of revenues derived from the property, or from a utility.
See Boykin v. Town of River Junction, 121 Fla. 902, 164 So. 558; Brash v. State Tuberculosis Board, 124 Fla. 167, 167 So. 827; State v. City of Tampa, 148 Fla. 6, 3 So.2d 484.
Two other questions are presented: first, that public health is a state rather than a county function, and second, that the revenue certificates are not for a local county or municipal purpose as distinguished from a state purpose and are, therefore, violative of Section 20 of Article III of the Constitution. These questions were settled in the case of Town of Palm Beach v. City of West Palm Beach, Fla., 55 So.2d 566, contrary to the contention of the appellants. The matter of public health and disease is not solely a local question. Disease is no respecter of persons, places or territories. Epidemics occur and disease spreads from person to person, from place to place, from territory to territory, and although it may be a local question, it is also a question of concern to the county and state governments. It is similar to a county road which may serve a local or county purpose and also a state purpose.
It is our conclusion that insofar as Chapter 27689 authorizes a levy of an ad valorem tax of all the taxable property of Madison County, Florida, the proceeds of which shall be used to pay the whole of, or in part, the principal and interest of the certificates of indebtedness involved in this case is violative of Section 6 of Article IX of the Constitution of Florida and, therefore, unenforceable in the absence of an approving vote of the freeholders of the county in accordance with the mandatory requirements of such constitutional amendment. Hence, it follows that the bill of complaint is not wholly without equity and that the decree appealed from should be and is hereby
Affirmed in part and reversed in part for further proceeding in accordance with this opinion.
*755 SEBRING, C.J., and HOBSON and ROBERTS, JJ., concur.
TERRELL, J., dissents.
TAYLOR, Associate Justice, dissenting in part and concurring in part.
THOMAS, J., not participating.
TERRELL, Justice.
I dissent on authority of State v. Florida State Improvement Commission, Fla., 48 So.2d 165; Tapers v. Pichard, 124 Fla. 549, 169 So. 39 and similar cases.
TAYLOR, Associate Justice (dissenting in part and concurring in part).
We have before us a decree of the Circuit Court of Leon County, Florida, validating certain bonds proposed to be issued by the Florida State Improvement Commission for the purpose of financing the construction of a hospital in Madison County.
Chapter 27689, Laws of Florida, Acts of 1951, creates a public corporation under the name of Madison County Health and Hospital Board, vests in it authority to exercise such public health functions as had previously been performed by Madison County and the municipalities within Madison County, and specifically authorizes its participation in the plan of financing the construction of a hospital hereinafter outlined.
The Madison County Health and Hospital Board has conveyed to the Florida State Improvement Commission certain real estate in Madison County. The Improvement Commission proposes to issue $120,000 of bonds, from the proceeds of which, together with certain other funds of Madison County and certain grants from the Federal Government, it is proposed to construct a hospital building on this land. The Improvement Commission then proposes to lease the entire property back to the Madison County Health and Hospital Board for a rental exactly corresponding to the amounts necessary to meet interest and principal payments on the bonds, and, when the bonds have been retired the Improvement Commission will reconvey the property to the Madison County Health and Hospital Board.
The payments of so-called rent to be made by the Madison County Health and Hospital Board are proposed to be made from an allocation of $10,000 of the money accruing to Madison County under the racing statutes, and, if necessary, an ad valorem tax of not exceeding three mills on the dollar of all taxable real and personal property within the county.
It is specifically provided that the levying of this tax for this purpose may be enforced by mandamus. Chapter 27689, Sec. 8(4).
Following the decision of this Court in the case of State of Florida v. Florida State Improvement Commission, Fla., 48 So.2d 165, the Circuit Court entered a decree validating the proposed bonds. If, this, and other recent decisions of this Court are to be adhered to, the decree should be affirmed.
However, the writer is so firmly convinced that these decisions are in error and fail to give the proper force and effect to Section 6 of Article IX of the Constitution that, being charged with the responsibility, albeit but temporarily, of participating in the deliberations of this Court, his obligation to the Constitution, rising above the weight of recent precedent and the profound respect which he has for the views of those who entertain a different opinion, impels him to dissent.
The historic background of a constitutional provision is of importance in its construction. The Florida Constitutions of 1838, art. 13, § 13, 1861, art. 13, § 11, and 1865, art. 13, § 10, F.S.A., imposed but slight limitations upon public bonds:
"The General Assembly shall not pledge the faith and credit of the State to raise funds in (the) aid of any corporation what(so)ever."
The Constitution of 1868 contains the following:
"The Legislature shall have power to provide for issuing State bonds bearing interest, for securing the debt (of the State,) and for the erection of *756 State buildings, support of State institutions, and perfecting public works.
"No tax shall be levied upon persons for the benefit of any chartered company of the State, or for paying the interest on any bonds issued by said chartered companies, or by counties, or by corporations, for the above-mentioned purposes." Article XII, Secs. 7 and 8.
Section 7, Article XII of the Constitution of 1868 was amended in 1875 to read as follows:
"The Legislature shall have power to provide for issuing State bonds bearing interest for securing the debt of the State, for the erection of State buildings, and for the support of State institutions; but the credit of the State shall not be pledged or loaned to any individual, company, corporation, or association; nor shall the State become a joint owner or stockholder in any company, association, or corporation. The Legislature shall not authorize any county, city, borough, township, or incorporated district to become a stockholder in any company, association, or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution, or individual."
The Constitution of 1885 as originally framed provided:
"The Legislature shall have power to provide for issuing State bonds only for the purpose of repelling invasion or suppressing insurrection, or for the purpose of redeeming or refunding bonds already issued, at a lower rate of interest." Sec. 6, Art. IX.
In 1930 this section was amended to read as follows:
"The Legislature shall have power to provide for issuing State bonds only for the purpose of repelling invasion or suppressing insurrection, and the Counties, Districts or Municipalities of the State of Florida shall have power to issue bonds only after the same shall have been approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such Counties, Districts, or Municipalities shall participate, to be held in the manner to be prescribed by law; but the provisions of this Act shall not apply to the refunding of bonds issued exclusively for the purpose of refunding of the bonds or the interest thereon of such Counties, Districts or Municipalities."
It will be noted that every change in the basic law of the State with reference to the issuance of bonds has been toward restricting the power of the Legislature in this respect. This is particularly significant when, during that same period in history there has been a strong and uninterrupted tendency toward the concentration in the State Government under legislative control of functions and powers previously performed and exercised upon a local basis, but which deal only with the receipt and expenditures of current revenues. Outstanding examples are the State Road program, the Common School System, and the Welfare program.
Adding to this the knowledge that the political subdivisions of the State, in the decade immediately preceding the amendment of 1930, had indulged in the issuance of so many bonds that many of them were unable to meet their obligations; that in others taxes necessary to meet maturities on these public debts had become so burdensome as to approach confiscation; and that the public credit had become definitely impaired, it is not difficult to understand the purpose and intent of the people in demanding that the freeholders be vested with the exclusive power to determine not only the wisdom of proposed public improvements of a non-essential nature, but the power to determine the necesssity for those public improvements which some might consider essential.
When the amendment of 1930 was proposed in the Legislature, when it was being considered by the people and when it was adopted there was no doubt as to what was meant by the term "Bond" as applied to a public obligation. It had been repeatedly defined by this Court as being *757 a promise to pay in the future the principal and interest of a public debt. Cheney v. Jones, 14 Fla. 587; In re Advisory Opinion to Governor, 94 Fla. 967, 114 So. 850; State ex rel. Davis v. Green, 95 Fla. 117, 116 So. 66.
It is an elementary principle of our system of government, and is expressly declared in the Bill of Rights in the Constitution of this State that "All political power is inherent in the people." Section 2, Bill of Rights. The power of the Legislature to create Counties, Municipalities and other subordinate agencies of government is derived from, but is limited by, the Constitution.
Almost immediately after the amendment of 1930, the question arose as to whether or not the amendment forbade the financing of proprietary, income-producing, utilities owned by political subdivisions in a corporate as distinguished from a governmental capacity, by a pledge solely and only of the net revenues accruing from the operation of such utilities, by the issuance of instruments called "Revenue Certificates".
One of the first and leading cases on this question is State v. City of Miami, 113 Fla. 280, 152 So. 6, 13. There the Court sustained the validity of such certificates, but in doing so emphasized that the utility to be financed was owned in a proprietary capacity; that only revenues arising from the net earnings of the utility were pledged; that no money arising from "any form of taxation" or "other property belonging to" the city were pledged. It is clear from a reading of the opinion that these were considered essential to the validity of the certificates.
In the case of Kathleen Citrus Land Co. v. City of Lakeland, 124 Fla. 659, 169 So. 356, 365, this holding was summarized as follows:
"The court was careful, however, in the Miami Case to clearly point out features which the borrowing plan must contain to be legal(.) the anticipated revenues from the system of waterworks only and solely should be pledged and the contractual terms of the certificates must affirmatively negative any and all legal obligation on the part of the city for the payment of the same as an indebtedness against anything except the special funds if, when and as realized and available for that purpose.
"Any scheme which may involve or be interpreted as constituting a direct, indirect or contingent pledge or obligation of the city's taxing power will bring it within the constitutional inhibition of creating the indebtedness without the consent of the freeholders in an election called to determine the question." (Emphasis in the original opinion.)
A pledge or mortgage of physical property, even that acquired by the issuance of the certificates, was held to be prohibited in Boykin v. Town of River Junction, 121 Fla. 902, 164 So. 558, and Brash v. State Tuberculosis Board, 124 Fla. 167, 167 So. 827.
In State v. City of Tampa, 148 Fla. 6, 3 So.2d 484, 485, this Court said:
"Amended section 6, Article IX, constitution, does not forbid the issuance by taxing units of written interest bearing evidences of indebtedness, whether called bonds or certificates, provided such indebtedness is not to be paid by taxation of any nature or by the use, pledge or application of any property other than the net proceeds from the operation of the property acquired through incurring indebtedness for a necessary public utility or facility to serve the immediate requirements of the public health, safety or welfare; and the evidences of indebtedness and the proceedings for their validation and issue should definitely state that payment of principal and interest of such indebtedness will be paid in whole or in part solely from the net receipts from the operation of the public utility or facility acquired by means of the indebtedness."
In Flint v. Duval County, 126 Fla. 18, 170 So. 587, 597, this Court said:
"The controlling purpose of amended section 6, article 9 of the Constitution is that, except upon the stated *758 approval vote of the freeholder electors of the taxing unit, the taxing power or the tax resources of a taxing unit shall not be pledged; and that the property or any interest therein of the taxing unit, shall not be pledged by any county, district, or municipality, when such property is obtained through taxation; and that property obtained otherwise than through taxation, may not be pledged when, if improvidently used, such property must be replaced or compensated for through taxation."
In State ex rel. City of Vero Beach v. MacConnell, 125 Fla. 130, 169 So. 628, 630, in the opinion on petition for rehearing the Court said:
"In other words, a municipality obligor undertaking to issue special fund utility revenue certificates payable solely out of future utility earnings and nothing else, as a special fund pledged specifically for that sole purpose, and without a vote of freeholders under amended section 6 of article 9, supra, may not make a valid and enforceable pledge of its rate-making powers as a means of raising a fund to repay the special fund revenue certificates out of future earnings of the utility, except upon the basis of its present earnings calculated on the basis of its existing rate structure, or its equivalent, in reasonable rates as applied to the utility for the anticipated earning period during which the funds are to be realized to retire the certificates, including the reasonable anticipation of the earning power of the utility as repaired, extended, enlarged, or improved. This is not to say that the rate structure may not be changed in accordance with legislative powers lawfully conferred on the municipal obligor. The prohibition is against the pledging of a rate-making power to be exercised in the future in excess of the general revenue producing power being exercised at the time revenue certificates are issued, and upon the basis of an anticipation of which, for the life of the certificates, the certificates themselves are presumptively to be issued."
From these, and scores of other decisions which express similar views, the writer can only draw the conclusion that this Court when the events leading up to the adoption of the amendment of 1930 were fresh in its mind, endeavored to construe the amendment in such manner as to conform to the purpose and intent of the people who wrote it into the Constitution and that this construction is practical, logical and the most liberal in favor of legislative authority that the words of the constitution will permit. As the writer summarizes this construction, it is simply this: A county, district, or municipality may possess a dual capacity, one governmental and the other corporate or proprietary; that the prohibition against the incurring of debt is intended primarily to restrict its governmental activities, because it is only through governmental powers that citizens can be forced to provide funds with which to discharge the debt; that no debt payable in the future with interest can be incurred if it requires the exercise of any governmental power to perform all the obligations assumed in incurring the debt. This, of course, eliminates the incurring of all debts payable from an exercise of the taxing power in any form. It also eliminates any pledge of property owned in a proprietary capacity but acquired by an exercise of the governmental power of taxation. It also eliminates the pledging of any governmental power in support of a proprietary activity, for example the exercise of a governmental rate making power as distinguished from a proprietary rate making power. It also eliminates the pledging of any property owned in a governmental capacity, or owned in a proprietary capacity if the latter is of such a nature that, if lost, the public interest would demand its replacement even if use of the governmental taxing power must be exercised to accomplish this. This construction permits a political subdivision to act in a proprietary capacity with respect to a proprietary asset in the form of a revenue-producing *759 utility and to issue, with respect to that utility revenue certificates payable solely from the anticipated revenues of that utility and use the proceeds of the certificates for the betterment of the utility. In this respect it acts largely as a private corporation but, unlike a private corporation, it may not mortgage its physical assets to secure its proprietary debts for one or both of two reasons. Usually at least some part of the utility is an asset acquired by the exercise of the governmental power of taxation. Usually, if not always, the utility is of such a nature that the welfare of the people demand its operation. If it is lost through a foreclosure it may be dismantled and cease operation, whereupon the public interest would demand its replacement even, if necessary, by the exercise of governmental powers. This is quite different from the covenant, approved in some of the earliest decisions, for the operation of the utility by a receiver if the certificates became in default. Under these conditions the people still have the benefit of the utility existing and operating in the community. If it cannot operate at a profit the municipality has lost nothing by reason of the relinquishment of temporary control of the property to a receiver.
More recent decisions of this Court depart entirely from those above cited, and approve the issuance of interest bearing covenants to pay public debts in the future with interest supported by the pledge of specific property owned in a governmental capacity and necessary for the protection of the city and its inhabitants, City of Jacksonville v. Savannah Machinery & Foundry Co., Fla., 47 So.2d 634, by a pledge of excise taxes and the future exercise of the excise taxing power, State v. City of Winter Park, 160 Fla. 330, 34 So.2d 740, and finally a pledge of a specific ad valorem tax on all real and personal property within the taxing unit. State of Florida v. Florida State Improvement Commission, Fla., 48 So.2d 165.
The case last cited, and others, adopt the view that necessity for the public improvement takes it out of the operation of the Constitution. There is nothing in the Constitution which so states. I cannot find it implied. With respect to state bonds, where the prohibition of the Constitution is absolute, two emergencies which will justify their issuance are expressly recognized by, and stated in, the Constitution. With respect to the bonds of subordinate taxing units, the Constitution could just as readily have qualified the limitations upon the power of elected officials to bind the people. It did not do so. The only conclusion which I can draw from this is that the people intended for the freeholders to determine the necessity and not to leave such determination to the Legislature, the local officials or the Courts.
It is one thing for the Courts to say, in the exercise of their best judgment, that a proposed public building is necessary. It is another for the Legislature to make this determination. It is still another for the people, or a designated class of the people, to decide the existence or non-existence of the necessity. When the construction involves the expenditure of current funds the Constitution permits a determination of the wisdom and necessity by the Legislature, or a delegation by the Legislature of this power to local officials. When the construction involves the incurring of a public debt, bearing interest, payable in future years, and payable from the public tax revenues of future years or the pledging of property, to replace which, if lost, taxes must be resorted to, the Constitution divests the Legislature of the authority to determine or to delegate to others the power to determine the wisdom or necessity of the bond issue. The Constitution places the final determination in the freeholders of the political subdivision and not elsewhere.
To suggest that the freeholders will not wisely determine the matter is to suggest the unwisdom of democratic government. To deny the power of the people, by constitutional mandate, to forbid the incurring of public debt without an approving freeholder election, even when the purpose is to provide something that the courts, the Legislature and the local officials deem to be of a most urgent and pressing necessity, *760 is to deny that "all political power is inherent in the people."
The more recent decisions of this Court, in the opinion of the writer, completely nullify the amendment of 1930.
In view of the opinions above cited the Circuit Court, being bound by the action of this Court, could not properly have done other than enter the decree of validation.
I feel that those opinions should be receded from; that we should return to the earlier construction of the Constitution and reverse the decree of validation.