THOMAS, Justice.
This controversy comes to this court by way of appeals from a decree of the Circuit Court of the Second Judicial Circuit validating $17 million of Everglades Parkway Revenue bonds issued 1 December 1963 by the Florida Development Commission for construction of a highway from a point east of Naples to a point west of Fort Lauderdale. The construction will be the joint undertaking of the Development Commission, the State Road Department and the Counties of Broward and Collier. In response to the rule to show cause why the bonds should not be validated, answers were filed by the State Attorneys of the Second and Fifteenth Judicial Circuits requesting that strict proof of the allegations of the petition be required. The City of Miami, East Florida Division AAA, Peninsula Motor Club, and G. R. Fletcher, as well as A. Ridgely Jones and Hampton Dunn, officers of automobile clubs, intervened and opposed the petition. The Seminole Tribe of Florida, the Seminole Tribe of Florida, a United States Corporation, Bill Osceola and Billy Osceola, also intervened, but only to urge confirmation of the bonds.
We are told that no parties from either of the counties involved challenged the legality of the issue.
The indebtedness is secured by pledges of the tolls received from users of the improvement, and of the 80 per cent, surplus of the second gasoline tax accruing to Broward and Collier Counties under the provisions of Sec. 16, Art. IX of the Constitution, F.S.A., through which counties, or into them, the highway will extend.
The movement toward construction of the highway originated with the adoption by the Boards of County Commissioners of Broward and Collier Counties of resolutions requesting and authorizing the Florida Development Commission and the State Road Department to enter into a Lease-Purchase Agreement for the purpose of building the road 78 miles in length, 27 miles of it in Broward County and 51 miles in Collier County.
First claim to monies to retire the bonds is to be upon tolls imposed upon travelers and, second, upon the uncommitted 80 per cent, of surplus tax funds accruing to the State Road Department to be expended in the construction of roads and bridges in the two counties affected.
The two counties have become committed to furnish rights of way through their respective areas. These commitments seem sufficient to proceed with the construction if the plan is otherwise legal, and the argument of the appellants that the issuance of the bonds prior to acquisition of rights of way is an abuse of discretion and, presumably premature, is rejected. Before proceeding to a discussion of the salient points, we comment upon the appellants’ criticism of the advisability of constructing the highway at the place and in the manner chosen by those in authority. We long ago, and frequently since, decided the court was not concerned with the wisdom of such projects. We are charged only with gauging the legality of the undertaking though conceivably a project might be as ill-advised as it is legal.
As we have written, the issues now presented were formed by the answer of City of Miami, which was a general denial of the allegations of the petition for validation, and the answer of G. R. Fletcher and others who generally denied the averments of the petition but also specifically challenged the validity of the proposed issue on the ground that the Lease-Purchase Agreement incorporated in the plan of financing would be a violation of Sec. 16, Art. IX, supra, because it would undertake to pledge the gasoline tax beyond July 1993. This position is not clear to us, inasmuch as all the bonds mature in 1991, unless the pleaders had in mind the pari passu bonds with which we will presently deal.
The proposed bonds confirmed by the Circuit Court had been previously approved by *172 the Florida Development Commission, the State Road Department and the State Board of Administration, as well as the Bond Review Board which was created by Chapter 63-335, Acts of 1963, and is composed of the President of the Senate, the Speaker of the House of Representatives, the Governor, the Comptroller, the State Treasurer, and one member of each House appointed by Kthe presiding officer.
j In brief, the Lease-Purchase Agreement executed by the Florida Development Commission and the State Road Department contained provisions that the former would sell the bonds, and lease the project to the latter. The Department became obligated to act as agent of the Commission in constructing, operating and maintaining the parkway, and on its own behalf to make “rental purchase payments” toward retirement of the bonds.
Upon discharge by the Department of all its covenants, and upon retirement of the bonds, the title of the improvement is to vest in the State and become a part of the highway system.
The bonds are to be retired from tolls collected by the State Road Department and if this revenue proves inadequate, resort will be had to the 80 per cent, surplus gasoline taxes, on deposit with the Board of Administration. Of the deficit 53 per cent, will be supplied from gasoline tax funds collected for the credit of Broward County and 47 per cent, from funds received for Collier County.
The Lease-Purchase Agreement also provides for pari passu bonds which are likewise secured but before they can be issued all rentals due under the agreement must have been paid, all obligations must have been performed and all conditions met.
The original bonds, with which we are immediately concerned, mature in the years 1968 to 1991, both inclusive, in amounts yearly ranging from $110,000 to $1,320,000.
The Lease-Purchase Agreement further provides that after the bonds are retired, tolls will continue to be collected until each county shall have been reimbursed for the gasoline tax it has expended on the proj ect and the State Road Department has been repaid the monies spent by it meanwhile for maintenance of the road.
The Lease-Purchase Agreement occupies about 70 pages in the record and obviously we have not given a digest of all the instrument, but we have tried to analyze only such parts of it as will afford a background of the litigation and an introduction of the questions propounded by the appellants.
The first point presented by the appellant, , City of Miami, follows:
“The Lease-Purchase Agreement between the State Road Department of Florida and the Florida Development Commission approved by Broward and Collier Counties is in direct violation of Section 16, Article IX of the Constitution of the State of Florida in that it provides for the expenditure of gasoline tax monies accruing to the counties for construction of roads not wholly within the county to which said funds accrue.”
The first point in the brief of the other appellants is essentially the same.
We construe the questions as a challenge of the overall plan we are describing and a specific assault on the provision of the Lease-Purchase Agreement that each county will underwrite a deficit of the other in the contribution of its share of the gasoline tax funds.
The validity of the bonds is questioned because the gasoline tax monies accruing to the subject counties will be expended on a highway constructed in both with the result, so they insist, as we understand it, that the part of the monies accruing to each county will not be wholly spent within the boundaries of that county. Acceptance of the position would require a literal translation of the language in Sec. 16(c), Art. IX of the Constitution, with reference to the expenditure of a county’s part of the second *173 gas tax for the construction of roads and bridges “within the county” and of the provisions of Sec. 339.08, Florida Statutes 1963, F.S.A., for use of such tax income “within the county to which such surplus applied * *
The objection of the appellants, to expenditure of the money of one county to build a road in another, is fortified, they insist, by the provision in the Lease-Purchase compact that in the event the share of one county in the gas tax shall be insufficient to pay its proportionate part of the monthly gas tax requirement, the other county will contribute such amount of its unpledged surplus as may be necessary to supply the deficit.
It is generally true that one county may not be compelled to contribute to the debts of another, Amos v. Mathews, 99 Fla. 1, 126 So. 308, but a careful study of the scheme for the construction of Everglades Parkway does not convince us that we may easily dispose of the challenge by simply saying that since the shares of the gas tax of two counties are to be used, and the road will lie in both counties and the amounts of gas taxes applied to the whole project in conformity with the percentage calculation the undertaking must be condemned. The contention seems to result from taking individual views of the two counties instead of considering the enterprise as a unit. Doubtless there will be variation in the cost of the highway because of factors such as topography, transportation facilities, types of soil and, possibly, even weather. All these are resolved when the project is considered as one effort, the common denominator being the entire investment of $17 million. From a practical standpoint, the construction of a highway the length of the State, were the admonition the appellants urge us to embrace followed, a plan such as the present one apparently sound in basic principle, would present the quandary of creating a bond issue for each county traversed with all the procedures, engineering, legal and fiscal, which are always complex to say the least. And, of course, the added cost of duplication of effort and expense would be considerable.
The appellees deny that the gasoline taxes of a county are being devoted to highway construction in another county and insist that the project will be realized from the proceeds of the bonds; that the tax funds are pledged only for rentals and are a secondary source at that, the primary source being the tolls, and it is insisted, incidentally that studies by nationally recognized traffic engineers indicate that after the first three years tolls alone will be sufficient to pay the rentals to discharge the bonds.
We agree with the appellees that the Florida Development Commission and the State Road Department had the authority to enter into the Lease-Purchase Agreement, State et al. v. Florida State Improvement Commission, Fla., 52 So.2d 277. And it would appear that appellants’ assault would be baseless if, instead of the installation being accomplished in the manner we have described, the whole operation from its inception until the work was completed and the bonds were retired was ‘done by halves.’ This, of course, brings us full cycle in our reasoning and to pursue the thought would require a strained construction to which we do not subscribe.
The general plan we consider here was approved by the court in State et al. v. Florida State Improvement Commission, Fla., 71 So.2d 146, and again we are brought to the question whether or not a road and bridge system, such as was involved in the former case of State et al. v. Florida State Improvement Commission, in which only tolls had been pledged, is impossible of accomplishment if the gasoline taxes are pledged and the project involves more than one county.
We think this problem has been solved in at least two instances by decisions of this court: State v. Escambia County, 153 Fla. 282, 14 So.2d 576 and Hodges et al. v. *174 Fernandina Port Authority in Nassau County et al., Fla., 38 So.2d 687.
In the Escambia case there was involved a bridge spanning Pensacola Bay between Escambia and Santa Rosa Counties. The bridge was a private toll bridge built and operated under a franchise granted by the two counties. Eventually Escambia County alone purchased the bridge. The county leased the bridge to the State Road Department after purchasing it with the proceeds of revenue bonds. The Department contracted to pay as rental for the property the 80 per cent, surplus gasoline tax funds accruing to the one county, Escambia. Despite the fact that the bridge lay also in Santa Rosa County, this court approved the plan.
The Hodges case concerned the use of the 80 per cent, gasoline tax funds of Duval and Nassau Counties in the construction of a tollway to be located partly in each county. Here again the improvement was leased to the State Road Department which promised to pay rentals from (1) tolls and (2) $40 thousand annually from the 80 per cent, gasoline tax funds of each county. The plaint about the plan by those who sought to defeat it was that the commitment of gas tax funds was unjust to Nassau County since but six miles of the'road would traverse its territory while other roads in the county needed attention. The facts demonstrated that an equal amount of funds from the gasoline taxes was committed by each county although 10 miles of the proposed road would exist in Duval County.
The apparent inequity seems to have been dismissed with the observation that “[t]he State Road Department considers such questions from the standpoint of the State road system” and “is the sole judge as to how and where * * * [the gas tax funds] shall be applied on these roads.” Hodges v. Fernandina Port Authority, supra.
We have already indicated the project should be considered as a unit toward the rental of which there are secondarily committed tax funds from the two counties affected. We say this although it appears in the record that unequal contributions are to be made by the two counties, in the unlikely event the income from tolls is insufficient, one to pay 47 per cent, of the deficit from its gas tax funds, the other S3 per cent. Just how these figures were reached we do not immediately know, but in any event, the Boards of County Commissioners agreed to them. And we are not dissuaded from the thought that the project should be considered as a whole by the provisions in Secs. 3.03(a) and (b), Article IV of the Lease-Purchase Agreement that if the gas tax fund of one county proved insufficient to meet the commitments of that county the other county would cause the amount of the deficiency to be transferred to the Sinking Fund from its funds, especially as the tolls are to continue to be collected, after the highway has been completed and all bonds have been retired, until monies taken from the gas tax funds have been replaced. In such circumstances the amounts contributed are but advances.
The appellees present a most convincing argument that the possibility of such a deficit developing is extremely remote if, indeed, it is not impossible, taking into account the three factors governing the distribution of the gas tax to the counties, which are area, population and contributions to road construction. They argue, in effect, that the first and last elements are static and that even if the second should be affected by the reduction of population of Collier County, for example, to one person by the census of 1970, there would be sufficient funds on hand to satisfy its pledge.
We adopt the view that the contingency, according to the record, is so far-fetched that the doctrine de minimis non curat lex may be invoked, State et al. v. Jacksonville Expressway Authority, Fla., 160 So.2d 513, but that does not preclude us from wondering why the provisions were ever incorporated in the plan. It is said in appellees’ brief that this “reciprocal feature was placed in the bond issue merely to avoid *175 the difficulty of explaining to investors that the practical operation of the gasoline tax distribution formula will prevent either county from ever being deficient in its gasoline tax funds” and that “[i]t is a marketing arrangement easily understood * * * [and] designed to obtain a slightly better interest rate.” In fine, we do not consider the provision of enough importance to defeat the whole plan. State v. County of Flagler, Fla.App., 77 So.2d 765.
An added point presented by appellants is a challenge of the project because it was not specifically authorized by the legislature as a prerequisite, so it is argued, by reason of the provisions of Sec. 340.02, Florida Statutes 1963, F.S.A., which pertain to the construction and operation of turnpikes. In Sec. 340.04 there appears a comprehensive description or definition of the sort of highway the legislature contemplated when Chapter 340, titled “Turnpike Authority,” was enacted. We think a study of the section is convincing that a much more elaborate installation than Everglades Parkway was intended to fall in the classification of ‘turnpike’ and that the more logical interpretation is that the present project is governed by the provisions of Chapter 288, Florida Statutes 1963, F.S.A., creating the Florida Development Commission.
The Florida turnpike act was passed by the legislature in 1953 and since it became effective this court has on at least one occasion, in State et al. v. Florida State Improvement Commission, 72 So.2d 28, approved a plan of financing a new installation such as the one under study. So we are constrained to rule against the appellants on this point.
Another question arises with reference to the issuance, we suppose eventually, of “pari passu additional bonds,” which according to Sec. 8.01(h) of the bond resolution shall be payable in installments beginning not later than three years from date and ending not earlier than the last maturity of any bonds then outstanding. So, say the appellants, funds could be pledged beyond the time when the provisions of Sec. 16 of Art. IX expire. The appellees simply reply that to say such bonds must mature not earlier than 1991 is not to say that they can mature later than 1993. We confess that to us the language of the resolution and the explanation of the appellees are not clear. We dislike to beg a question but we are inclined to adopt the view of the ap-pellees that the validity or invalidity of pari passu bonds should be left to a later day. So this decision is not to be construed as any adjudication of the validity or invalidity of such bonds.
Lastly the appellants complain about the provisions for reimbursement of the counties for the amounts of gas tax money expended and the Road Department for the sum spent for upkeep. It is insisted that this procedure violates Sec. 16 of Art. IX, but we are unable to detect any such conflict. We repeat that this reimbursement is to be made from the tolls which will continue to be collected after the bonds are retired.
Our close study of the complex record has not revealed any abuse of discretion on the part of officials charged with the handling of the project, nor are we convinced of any reason for disturbing the decree of the circuit judge validating and confirming $17 million of Everglades Parkway bonds, so it is—
Affirmed.
DREW, C. J., and ROBERTS, CALDWELL and ERVIN, JJ., concur.