MeDONALD, Chief Justice.
The state appeals a final judgment validating the issuance of $100,000,000 in multifamily mortgage revenue bonds to be used to finance the construction of low and middle income housing in Pinellas County. This Court has jurisdiction pursuant to article V, section 3(b)(2), Florida Constitution. We affirm the final judgment.
On October 12, 1982, the Board of County Commissioners of Pinellas County passed a resolution declaring the need for a county housing finance authority that would work to alleviate both the shortage in housing for persons and families of moderate, middle, or lesser income and the shortage of capital for investment in such housing. On the same day, the commission enacted an ordinance establishing the Housing Finance Authority of Pinellas County, Florida (Authority). On April 16, 1986, the Authority filed in the Sixth Judicial Circuit Court a complaint seeking validation of $100,000,000 in multifamily mortgage revenue bonds to be used to finance the construction of low and middle income housing in Pinellas County. Following the issuance of an order to show cause and the appropriate publication of public notice, the circuit court held hearings on August 28 and October 30, 1986.
During these hearings, the Authority introduced evidence regarding the need for the bond issue and the legal requirements for the mortgages and other security devices that would ultimately be executed in connection therewith. Evidence concerning the need for the bond issue centered largely around a study prepared for the Authority demonstrating the need for additional low and moderate income family housing in Pinellas County and the expert testimony interpreting that study. As for the security devices in question, the state contended that because the Authority had failed to present the relevant mortgage and security forms during the validation proceeding, the bond issue could not be validated. In response, the Authority argued that due to the nature of the issue, which would be used to finance a number of future housing projects and would therefore be issued in multiple series, each with its own unique type of security device, the law did not require the Authority to present the actual form of each security device at the validation stage. After hearing all the evidence, the circuit court issued a final judgment of validation on November 3, 1986, expressly reserving the right of the state or the public to challenge the mortgages or other security devices ultimately selected. The state now appeals this validation.
The state first argues that during the validation proceedings the Authority failed to present substantial competent evidence demonstrating that the bond issue serves a public purpose. In support of this contention, the state argues that more than one-fourth of a $100,000,000 1983 bond issue for multi-family housing remains unused. Moreover, the state contends not only that the housing study was misleadingly skewed toward need, but also that the only need even remotely demonstrated was a future projected need for three-bedroom apartments for families earning under $15,000 per year. We cannot agree.
First of all, we find the state’s implication that a portion of the 1983 bond issue is still available to be erroneous. Testimony indicated that, because of a change in IRS policy regarding loans to lenders, the method by which the 1983 bond issue was structured, the Authority found it necessary to cancel the remaining portion of the 1983 validation. Indeed, rather than weigh against a finding of need, we view this loss of approximately one-quarter of the preexisting bond issue to strengthen the Authority’s need argument. As for the content of the study, the state specifically alleges that 1,000 empty apartment units were omitted from the study, as were approximately 11,-328 other units which were either proposed, under construction, or in the initial phases of lease up when the study was conducted. *399 The author of the study testified, however, that while two specific complexes with less than 1,000 total units were omitted from the study, they were omitted because they had a history of abnormally high vacancy rates during even the tightest of rental markets and were, therefore, not representative of overall market conditions. We do not find this explanation to be unreasonable. Nor can we say with any certainty that it was misleading to omit from the study units that were either proposed or still under construction because at the time of the study there was no guarantee that they would ever reach the market. Indeed, testimony indicated that developers had abandoned several such projects that the Authority had induced for financing. As for the remaining 2,400 units that were allegedly in the initial stages of lease up when the study was conducted, we will not second guess the authors of the housing study as to whether these units should have been included in the vacancy total because we do not view this statistical exclusion as compromising of the overall data.
The state next contends that the study itself failed to show any need for the proposed bond issue. Again, we cannot agree. The study estimates that the population of Pinellas County will rise by 24,800 new residents per year through 1990. At the same time, the demand for family-sized housing is expected to increase significantly as more young families move into the county. Although all parties appear to acknowledge that Pinellas County is presently experiencing its highest rental vacancy rate in some time, the study indicates that excess to be only 1.8% over the rate considered desirable. Such a small excess could be rapidly absorbed given even a small change in economic conditions. Indeed, the study predicts that the excess supply will evaporate by mid-1987. Moreover, because new apartment complexes with abnormally high vacancy rates often are unavailable to lower and moderate income families, the overall county vacancy rate may underestimate vacancy rates among apartment units available to this category of prospective renters. Further, we disagree with the state’s contention that the judge’s record statements made during the validation proceedings indicate he only found a need for a portion of the $100,000,000 bond issue. Although the judge’s comments do indicate that three bedroom apartments for families earning under $15,000 per year were shown to be in greatest need, we do not interpret his comments as clearly indicative of more.
Providing housing for moderate, middle, and lesser income households without question serves a public purpose. State v. City of Pensacola, 397 So.2d 922 (Fla.1981); State v. Housing Finance Authority, 376 So.2d 1158 (Fla.1979). Pursuant to section 159.602, Florida Statutes (1985), the Florida Legislature has specifically found a shortage of affordable housing and capital for investment in such housing in this state. Furthermore, the legislature declared that these shortages can only be relieved through the encouragement of private investment and through the use of public financing. Id. § 159.602(2). Accordingly, the legislature declared the financing, acquisition, construction, reconstruction, and rehabilitation of housing to be necessary and a valid public purpose for which public money may be spent, advanced, loaned or granted. 376 So.2d at 1159; §§ 159.602(3) & (4), Fla.Stat. (1985). More specifically, section 159.612(1), Florida Statutes (1985), authorizes housing finance authorities to issue revenue bonds from time to time for this purpose. Such legislative declarations of public purpose are presumed valid and should be considered correct unless patently erroneous. Pepin v. Division of Bond Finance, 493 So.2d 1013 (Fla.1986); Zedeck v. Indian Trace Community Development District, 428 So.2d 647 (Fla.1983); State v. Sunrise Lakes Phase II Special Recreation District, 383 So.2d 631 (Fla.1980). In the instant case, we find that the statistics reflected in the housing study support the Authority’s finding of a local need in Pinel-las County for the bond issue. The state has failed to demonstrate that issuing *400 bonds to aid in the financing of low and middle income housing construction would not serve a public purpose and benefit the citizens of Florida in general and the residents of Pinellas County in particular.
As its final argument, the state contends that the circuit court should not have validated the bond issue because the mortgages and other security devices that will eventually constitute the source of revenues for paying the bonds were not presented to the validating court. All parties agree that the law mandates revenue bonds be secured by mortgages or other security devices. § 159.612(2), Florida Statutes (1985). The Authority contends, however, that because it plans to issue the proposed bonds in multiple series, each with -its own unique type of security device depending on the project involved, requiring the Authority to provide the precise forms at the validation proceeding would deprive it of the future flexibility necessary to meet its legislative mandate. We agree. The documents presented to the circuit court during the validation proceedings set forth the requirements which any security device ultimately executed would have to satisfy. Moreover, paragraph 22 of the validation order specifically stated:
To the extent that bonds are to be secured pursuant to mortgages or security devices which were not before this court at validation, and such documents contain provisions that do not satisfy the requirements of the bond resolution, the trust indenture, or other requirements of law, this validation would not preclude subsequent challenges to these documents not before the court as enunciated in Glatstein v. City of Miami, 399 So.2d 1005 (Fla.3d DCA 1981).
Thus, the circuit court validation order specifically preserved the right to challenge the chosen security devices at a later time. In light of this specific reservation, we hold the validation proper despite the fact the security forms were not before the validating court.
A judgment of validation of revenue bonds comes to this Court with a presumption of correctness and the burden is on the appellant to show that the record evidence fails to support the conclusions of the issuing authority and of the trial court. International Brotherhood of Electrical Workers, Local Union No. 177 v. Jacksonville Port Authority, 424 So.2d 753 (Fla.1982). The state has failed to meet this burden. Finding no error, we affirm the final judgment validating the bond issue.
It is so ordered.
OVERTON, EHRLICH, SHAW, BARRETT, GRIMES and KOGAN, JJ„ concur.