777 So.2d 958 (2001)
Suzanne M. BOSCHEN, Appellant,
v.
CITY OF CLEARWATER, etc., Appellee.
No. SC96874.
Supreme Court of Florida.
January 18, 2001.
*959 Patrick T. Maguire, Clearwater, FL, for Appellant.
Robert C. Reid, Randall W. hanna and Ken Guckenberger of Bryant, Miller and Olive, P.A., Tallahassee, FL; and Pamela K. Akin, City Attorney, Clearwater, FL, for Appellee.
QUINCE, J.
We have on appeal a decision of the trial court declaring a proposed bond issue valid. We have jurisdiction. Art. V, § 3(b)(2), Fla. Const. For the reasons expressed below, we hold that competent, substantial evidence supported the finding that the proposed project was in furtherance of public health and safety and affirm the bond validation judgment.

BACKGROUND
The City of Clearwater (the City), filed a complaint for bond validation with the Sixth Judicial Circuit Court in Pinellas County. Suzanne Boschen (Boschen) filed an answer, contesting the design, engineering, and purpose of the project, and the City's authority to issue the bonds. The trial court validated the bonds, and this appeal followed.
Pursuant to article IX of the City's Charter, which requires the City to provide fiscal aspects of bond issuances by ordinance, the City enacted Ordinance No. 6352-99 on May 6, 1999, authorizing the issuance of Infrastructure Sales Tax Revenue Bonds, Series 1999, to finance the cost of capital improvements in Clearwater. *960 See City of Clearwater, Pinellas County, Fla., Ordinance 6352-99 § 3 (May 6, 1999) (hereinafter Bond Ordinance). On the same day, the City enacted Resolution 99-28, authorizing the bonds to be issued in a principal amount not to exceed $12,000,000.00 to finance the cost of roadway and related capital improvements on Clearwater Beach. See City of Clearwater, Pinellas County, Fla., Resolution 99-28 § 2, Ex. A (May 6, 1999) (hereinafter Resolution 99-28). The City did not hold a public referendum for the issuance of the bonds.
The Bond Ordinance specifies that the sole source of repayment of the bonds is derived from the City's infrastructure sales tax revenues. See Bond Ordinance § 3(B). These revenues are generated pursuant to an interlocal agreement with Pinellas County and other participating municipalities regarding the distribution of the additional infrastructure sales tax revenues collected by Pinellas County. See id. § 2 (defining "Sales Tax Revenues"). The Bond Ordinance further provides that the City shall never be required to levy ad valorem taxes to fund repayment of the bonds. See id. § 3(D). According to Margaret Simmons, the City's financial services administrator, the City's share of the infrastructure sales tax revenues is adequate to fund repayment of the bonds. The City issued the bonds pursuant to article IX of the Charter, which requires a public referendum for the issuance of bonds in excess of $1 million. See City of Clearwater, Pinellas County, Fla., Charter art. IX (March 9, 1999) (hereinafter Charter). The exceptions to this referendum requirement are revenue bonds issued for public health, safety or industrial development, and refunding. See id.
In its legislative findings, enumerated in Resolution 99-28, the City concluded that the project was necessary for the continued health and safety of the citizens and visitors in Clearwater. See Resolution 99-28 § 1(B). Indeed, the City concluded that the proposed changes would increase the roadway's level of service, improve air quality, and provide a safer environment for pedestrians. See id. Ex. A. The City further noted that this conclusion was reached after reviewing extensive information and input from its staff, public hearings, and professional consultants. See id. § 1(A). The project proposes several improvements to the entranceway at Clearwater Beach, including construction of a traffic roundabout, roadway realignment, elimination of the signal system, pedestrian crossings, landscaping, and a water fountain central to the roundabout. See id. Ex. A.
At the validation proceeding below, the City presented evidence to explain its process for assessing the necessity and feasibility of the proposed roadway improvements. According to the public works administrator, Richard Baier, the site for the roadway project has three major intersections which have experienced higher than average accident counts. Nevertheless, the site is not one of the top ten accident locations in the city, and the present level of service for traffic operations is considered acceptable. The City's Public Works Department, which oversees road design, commissioned a traffic study to examine and analyze traffic volumes and movements in the Clearwater Beach area. After receiving the traffic study, the Public Works Department and the City's master planner researched options for reconfiguring the intersections. They considered various factors, including the traffic study data, the number of pedestrian and vehicle-to-vehicle accidents, and the area's seasonal peaks. After they presented options for redesigning the intersections to the City Commission, the Commission decided on the roundabout concept as the preferred design and hired a design consultant to pursue preliminary engineering designs. According to the public works administrator, the purpose of the preliminary engineering report was to identify the objectives of the project, synthesize *961 data collection, and lay a foundation for the design. In selecting the roundabout design as its preferred alternative, the City relied, in part, on data suggesting that the roundabout would improve air quality. Indeed, the City issued a Congestion Mitigation Air Quality report (CMAQ report), stating its conclusion that air pollutants would be reduced by substituting the present multiple intersection design with the proposed roundabout design. The City further concluded that the landscaping of the roundabout could be used to calm traffic leading into the beach, thereby reducing pedestrian accidents. According to the public works administrator, "every element in the project was purposely done to create a total design concept, both to facilitate pedestrian movement and vehicle movement, and to allow them to co-exist in that constrained right of way." Indeed, "the project was primarily for transportation purposes. Economic development was a secondary benefit...." The Public Works Department and its consultants made additional visual and oral presentations to a number of bodies, including the Metropolitan Planning Commission (MPO), the Citizens Advisory Committee of the MPO, and the Traffic Control Committee of the MPO. After reviewing findings from its consultants and staff, the City Commission approved the project and authorized the issuance of bonds to be repaid with proceeds of the City's infrastructure sales tax revenues.
Notwithstanding the City's findings, conflicting evidence intimated that the reconstruction of the beach site was motivated by different concerns. Despite the public works administrator's testimony regarding the transportation purposes of the project, notes from the design team meetings indicate that "the primary purpose of this project is economic redevelopment of the beach, not maximizing traffic flow." Further, these notes indicate that the twin principles for the project are developing a place to have an experience and providing a sense of arrival at the beach. Similarly, the traffic study indicates that the improvements are designed "primarily to support and enhance the economic redevelopment potential for the Beach area."
Additional evidence was introduced to cast doubt on the propriety of the City's decision. For example, the traffic study indicated that roundabout traffic conditions would be equivalent to traditional signalized control and not as efficient as the current one-way system. In addition, the level of growth over the next twenty years is considered relatively minor, at 2000 additional cars per day. Reginald Mesimer, an expert traffic engineer, testified that he conducted an independent review of the traffic study and engineering report and concluded that the roundabout's projected level of service would actually be decreased by two levels due to the engineering report's failure to account for pedestrians. The engineer, however, also testified that he offered no input to the City Commission and was present at a meeting where the project was discussed, but did not express any opinion as to the project's alleged deficiencies.
In response to Boschen's challenge to the financing of the project without prior referendum approval, the trial court concluded that the City had authority to issue the bonds pursuant to chapter 166, Florida Statutes, which addresses municipal home rule powers, the Charter, and the Bond Ordinance. The court declined to second-guess the City Commission's approval of the engineering and design concept of the project. It noted that objections to these aspects of the projects were better handled through the legislative, not judicial, process. The court held, as a matter of law, improvement of traffic circulation and reduction of speed in congested areas constitute essential governmental responsibilities. In so doing, it recognized that the provision of sidewalks, enlarged walkways, and crosswalks fell within the ambit of essential governmental responsibilities. The court further found that although the *962 fountain and landscaping were part of the aesthetic presentation, they were inextricably intertwined with the overall project, which was designed to slow traffic within the traffic circle. Boschen filed a notice of appeal invoking this Court's mandatory appellate jurisdiction under article 3(b)(2).

ANALYSIS
This Court's inquiry in bond validation proceedings is limited to three legal issues: whether the public body has the authority to issue the bonds; whether the purpose of the obligation is legal; and whether the bond issuance complies with the requirements of law. See State v. Osceola County, 752 So.2d 530 (Fla.1999); State v. Inland Protection Fin. Corp., 699 So.2d 1352, 1355 (Fla.1997); Washington Shores Homeowners' Ass'n v. City of Orlando, 602 So.2d 1300, 1301 (Fla.1992). A final judgment validating bonds comes to this Court with a presumption of correctness. Osceola County, 752 So.2d at 533; see Wohl v. State, 480 So.2d 639, 641 (Fla. 1985). The burden of proof is on the appellant, who must demonstrate that the record and evidence fail to support the lower court's conclusions. See id.
The second and third prongsthe legality of purpose and compliance with bond issuance requirementsare not in dispute. Indeed, Boschen concedes that a legitimate municipal purpose exists. As we noted in Linscott v. Orange County Industrial Development Authority, 443 So.2d 97, 101 (Fla.1983), the expenditure of public funds is legal if it serves a valid public purpose. We have broadly construed "public purpose," recognizing that road construction, see Northern Palm Beach County Water Control Dist. v. State, 604 So.2d 440, 443 (Fla.1992), development of recreational facilities, see Osceola County, 752 So.2d at 538, and aesthetic presentation, see City of Lake Wales v. Lamar Adver. Ass'n, 414 So.2d 1030 (Fla. 1982), all satisfy the "public purpose" requirement in bond validation cases. See generally City of Boca Raton v. Gidman, 440 So.2d 1277, 1280 (Fla.1983) (noting the broad construction of "municipal purpose"); see also State v. City of Jacksonville, 50 So.2d 532, 535 (Fla.1951) ("Though there was a time when a municipal purpose was restricted to police protection or such enterprises as were strictly governmental that concept has been very much expanded and a municipal purpose may now comprehend all activities essential to the health, morals, protection and welfare of the municipality.").
Similarly, there is no valid challenge to the City's compliance with chapter 75, Florida Statutes. Chapter 75 outlines the procedures for validating bonds. In accordance with these guidelines, the City enacted an ordinance authorizing the issuance of bonds, adopted a resolution approving the beach entranceway project, and filed a complaint for validation in the circuit court, which properly joined the State, taxpayers, property owners, and citizens of Clearwater. In short, the City complied with the requirements of chapter 75 in seeking to issue and validate the bonds. See generally Osceola County, 752 So.2d at 540 (holding that Osceola County, which followed the same course of action, was not required to do anything more).
Although Boschen challenges the City's authority to issue bonds for the proposed project without prior referendum approval, there is generally ample authority for the City's issuance of bonds to finance capital improvements. First, the relevant constitutional restriction on municipal bond issuance, article VII, section 12, Florida Constitution, is inapplicable to the bonds at issue.[1] Article VII, section *963 12, authorizes municipalities to issue bonds to finance capital projects, but requires a referendum when the bonds are payable from ad valorem taxation. See art. VII, § 12, Fla. Const. In the instant case, the funds for repayment of the bonds are derived solely from the pledged infrastructure tax revenues and do not include ad valorem taxes. Thus, the City's issuance of bonds does not trigger the state constitutional referendum requirement. See, e.g., State v. Sarasota County, 549 So.2d 659, 660 (Fla.1989). Second, article VIII, section 2, Florida Constitution, has been construed repeatedly as giving municipalities broad home rule powers, providing that municipalities "may exercise any power for municipal purposes except as provided by law." Art. VIII, § 2(b), Fla. Const.; see State v. City of Sunrise, 354 So.2d 1206, 1209 (Fla.1978). Third, pursuant to this constitutional provision, the Legislature enacted the Municipal Home Rule Powers Act, codified in chapter 166, Florida Statutes, which provides that municipalities shall have full authority to issue bonds. See §§ 166.021, 166.111(1), 166.141, Fla. Stat. (1999); see also Washington Shores, 602 So.2d at 1302 n. 2. Fourth, the Charter similarly vests the City with broad authority. See Charter art. I, § 1.01, art. IX. Fifth, the City's Bond Ordinance specifically authorizes the issuance of the bonds for the proposed project. See Bond Ordinance § 3.
As previously mentioned, however, the Charter's referendum requirement limits the City's authority to issue bonds in excess of $1 million that are not in furtherance of public health and safety. Consequently, the issue in the present case is whether the City is authorized to issue bonds without prior referendum approval for the purpose of reconstructing the proposed roadway site. More specifically, we must determine whether the Charter's public health and safety requirement is synonymous with the earlier restrictive notion of essential governmental functions and whether the evidence supported the trial court's conclusion that the proposed project fell within the ambit of public health and safety.
Boschen contends that the public health and safety exception to the Charter's referendum requirement includes only essential government functions. In effect, Boschen asserts that the Charter's public health and safety exception was an expression of the voters' will to retain the more stringent essential government function doctrine in limited circumstances. The City, by contrast, contends that the 1968 revisions to the Florida Constitution rendered the essential governmental function doctrine obsolete.
Article IX of the Charter provides that a Bond Ordinance must "contain a provision requiring that revenue bonds for projects in excess of one million dollars shall be put to public referendum with the exception of revenue bonds for public health, safety or industrial development and revenue bonds for refunding." Charter art. IX. Boschen contends that this exception is synonymous with the judicially created essential governmental function doctrine, which originated in interpreting the 1930 amendment to article IX, section 6, of the 1885 Florida Constitution. Indeed, that constitutional provision, as amended, provided:
[T]he Counties, Districts or Municipalities of the State of Florida shall have power to issue bonds only after the same shall have been approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such Counties, Districts, or Municipalities shall participate, to be held in the manner to be prescribed by law.
*964 Art. IX, § 6, Fla. Const. (1885). Thus, local government entities were prohibited from incurring bond indebtedness without prior referendum approval from the affected citizens. Indeed, prior to the 1930 amendment to article IX, section 6, that provision only applied to the state and permitted bond issuances only for purposes of repelling invasion or suppressing insurrection. See art. IX, § 6, Fla. Const. (1885); see also State v. City of Panama City Beach, 529 So.2d 250, 252 (Fla.1988), receded from on other grounds, State v. City of Orlando, 576 So.2d 1315 (Fla.1991). Consequently, local bond issuances flourished, although widespread defaults soon followed. See City of Panama City Beach, 529 So.2d at 252. As the Court noted, the stringent referendum requirement encompassed in article IX, section 6, was imposed during times of economic hardship to curtail capricious and improvident spending and to prevent local governments from further weakening the state's credit. See State v. Florida State Improvement Comm'n, 60 So.2d 747, 751, 753 (Fla.1952) (describing the issuance of bonds preceding the depression and the ensuing financial hardship that led to the adoption of amended article IX, section 6). However, in enforcing this strict constitutional provision, we recognized the need for a liberal interpretation only with regard to the most basic and necessary functions of government. See id. at 753. This perceived need reflected our recognition that the constitutional provision was not enacted to thwart counties' ability to maintain critical operating functions. See id.; see also Leon County v. State, 122 Fla. 505, 165 So. 666, 669 (1936). Indeed, the justification for this exception was not only that courthouses and jails were so essential that they warranted special treatment, but also that their essentiality had been established prior to the 1930 amendment to article IX, section 6. See State v. County of Manatee, 93 So.2d 381, 382 (Fla.1957). Thus, despite the explicit constitutional provision, we repeatedly held that prior referendum approval was not required if the bond obligation supported an essential governmental necessity.
In a long line of cases, we consistently reaffirmed this doctrine, but sharply limited its application. Indeed, the test of essentiality was very restrictivewhether the county government would cease to exist if the improvement was not provided. See County of Manatee, 93 So.2d at 383. Accordingly, we held that courthouses, see Posey v. Wakulla County, 148 Fla. 115, 3 So.2d 799 (1941), jails, see Tapers v. Pichard, 124 Fla. 549, 169 So. 39 (1936), public health centers, see State v. Florida State Improvement Comm'n, 48 So.2d 165 (Fla. 1950), and mobile fire stations, see City of Jacksonville v. Savannah Mach. & Foundry Co., 47 So.2d 634 (Fla.1950), were so necessary to the operation of local government that they were exempted from the referendum requirement. However, we declined to recognize the essentiality of county hospitals, see Florida State Improvement, 60 So.2d at 754; County of Manatee, 93 So.2d at 383-84, voting machines, see State v. Broward County, 54 So.2d 512 (Fla.1951), and the acquisition of rights-of-way for road construction, see Yon v. Orange County, 43 So.2d 177 (Fla. 1949). Thus, despite the health and safety concerns inherent in providing hospitals and constructing roads, we limited the doctrine to situations that were vital to the governance of the locality.[2]
We revisited the issue of the doctrine's continuing viability in State v. County of Dade, 234 So.2d 651 (Fla.1970). Notwithstanding the foregoing line of cases, we held the 1968 revision to the constitution superseded our prior decisions regarding the authority of local governments to issue bonds without referendums. See id. at *965 652-53. To be sure, we noted that the new constitutional provision, article VII, section 12, was more restrictive than the former provision because it expanded the scope of prohibited forms of indebtedness without prior referendum approval. See id. at 653. Nonetheless, we explicitly abandoned the essential governmental function doctrine as the test for determining when referendum approval was required. Moreover, we reiterated our repudiation of this doctrine in State v. School Board of Sarasota County, 561 So.2d 549, 553 (Fla.1990). In that case, we stated:
Appellees, in addition to asking us to validate these bonds, invite us to reinstitute the "essential governmental function" referendum-exception first enunciated in Tapers v. Pichard. We rejected the exception in State v. County of Dade and decline to reinstate it here.
Id. (citations omitted). Thus, we have explicitly recognized that our prior concept of what constitutes an essential governmental function doctrine is no longer viable.
Nevertheless, Boschen contends the Charter's public health and safety exception reinstated the older doctrine in Clearwater. This argument is wholly devoid of merit. First, the plain language of the Charter does not support this interpretation. By using the words "public health, safety or industrial development," the Charter refers to situations that could reasonably be construed as falling within the ambit of those categories. To be sure, the stipulation that the bond obligation must preserve public health and safety indicates a more narrow objective than routine municipal purposes. But given the absence of any explicit reference to the essential governmental function doctrine, the language cannot reasonably be construed as resurrecting this stringent exception to the former constitutional referendum requirement. Second, contrary to Boschen's contentions, the citizens of Clearwater did not expressly retain this exception merely by voting not to repeal article IX of the Charter in March 1999. Indeed, the ballot for that election merely crossed out current article IX and inquired whether voters would support its repeal. Although voters elected to maintain article IX, they did not vary its express terms. Therefore, voter retention of article IX in no way suggests that the electorate also intended to incorporate the essential governmental function doctrine. Third, our express repudiation of this stringent restriction is further evidence that the Charter should not be interpreted as reinstating the doctrine. Fourth, the rationale of the doctrine is no longer applicable. It was created at a time when local governments had little authority to finance important government projects without prior referendum approval. In recent years, local governments' authority to issue bonds has increased significantly. See generally art. VII, § 2, Fla. Const. Moreover, the doctrine itself is unduly restrictive, in part because it struck a balance between the need for essential governmental operations and the duty to follow the former constitutional provision, which expressly imposed referendum requirements on local government spending in most circumstances. Thus, given the historical underpinnings of the doctrine, it is imprudent to construe the Charter as incorporating this stringent exception, especially without any credible evidence indicating such an intent. To be sure, the City could elect to limit its authority further by including more stringent requirements in the charter. However, there is no evidence to indicate that it did so. On the contrary, the Charter vests the City with broad governing authority.[3] *966 In short, the exception to the referendum requirement refers only to bond obligations that improve "public health, safety and industrial development," and this term should not be construed as the equivalent of essential governmental functions.
As previously stated, the Court must also determine whether the evidence presented at the validation hearing supported the trial court's validation of the bonds. Boschen contends that the evidence failed to establish that there was an essential governmental imperative for the project. According to Boschen, the evidence did not support the City's decision to reconstruct the entranceway, but rather revealed that the proposed improvements were designed to stimulate economic redevelopment.
The City, by contrast, contends that legislative determinations are presumed valid, and that bonds for road improvements warrant validation because they necessarily involve the public's health and safety. Moreover, the City contends there was ample evidence to support the legislative determination that the project furthered public health and safety.
Generally, "legislative declarations of public purpose are presumed valid and should be considered correct unless patently erroneous." State v. Housing Fin. Auth. of Pinellas County, 506 So.2d 397, 399 (Fla.1987); accord Zedeck v. Indian Trace Community Dev. Dist., 428 So.2d 647, 648 (Fla.1983); see also Nohrr v. Brevard County Educ. Facilities Auth., 247 So.2d 304, 309 (Fla.1971) ("The finding of the Legislature is determinative, and Defendant has failed to show that such determination was so clearly wrong as to be beyond the power of the Legislature."). Moreover, the wisdom or desirability of a bond issue is not a matter for our consideration. See State v. Sunrise Lakes Phase II Special Recreation Dist., 383 So.2d 631 (Fla.1980). Indeed, we have recognized that so long as the Legislature does not exceed its constitutional authority, our review of legislative declarations is limited. For example, in Northern Palm Beach County, we held that on-site road improvements in a private development, including landscaping and construction of an overpass, constituted a valid public purpose. See 604 So.2d at 442-43. In so doing, we gave effect to the resolution adopted by the local authority which provided that the proposed roadway improvements promoted health and safety. See id. at 442. We noted that although these legislative expressions of public purpose were not controlling, they were entitled to great weight. See id. In Resolution 99-28, the City found that the project was necessary for the continued health and safety of the citizens of Clearwater and that financing the project with the bonds at issue was in furtherance of public health and safety. See Resolution 99-28 § 1(B). Pursuant to the foregoing cases, this legislative determination warrants deference from this Court.
Although the City's legislative findings are not entirely dispositive, the record demonstrates that these findings were not clearly erroneous. The City contemplated several health and safety concerns before approving the project, including accident rates, pedestrian safety, air pollution, and traffic speeds. Furthermore, the City thoroughly investigated and evaluated the project's public utility. Indeed, the City analyzed traffic volumes, researched options for reconfiguring the intersections, made visual and oral presentations to a number of bodies, and consulted heavily with its internal staff.
Although the traffic study exposed inconsistencies regarding the basis for constructing roadway improvements, there was substantial evidence to the contrary. While the traffic study suggested that improvements would not be cost effective *967 since there were no major operational deficiencies, it also acknowledged that poor operating conditions occurred during peak periods, congestion could occur when traffic and parking were not properly managed, and additional parking spaces to accommodate the peak season were necessary. The study further noted that reconfiguring one of the intersections and separating pedestrian/bicycle and vehicular traffic would mitigate the number of accidents.
Furthermore, the conclusions of the traffic study are not dispositive because the engineering report, which utilized the data collected in the traffic study, made contrary conclusions and evaluated the project in light of the proposed roundabout design, which was not thoroughly explored in the traffic study. The engineering report made several findings that buttressed the City's legislative determination concerning public health and safety: the roundabout design considers safe pedestrian/bicycle circulation to be of paramount importance; a roundabout design would improve capacity when compared to a signalized system; the design would reduce speeds; roundabouts typically reduce the number of accidents that occur by sixty to seventy percent; overall delay would be considerably less; and roundabouts were safer overall because of speed control, reduction of conflict points, decrease in severity of accidents, and consideration of environmental factors. Although testimony of the expert traffic engineer conflicted with the City's ultimate conclusions regarding the level of service, these contrary conclusions were never submitted to the City.
We recognize that "legislative bodies have broad discretion in determining what measures are necessary in order to protect the public health, safety, and general welfare." Metropolitan Dade County Fair Hous. & Employment Appeals Bd. v. Sunrise Village Mobile Home Park, Inc., 511 So.2d 962, 965 (Fla.1987). More importantly, this Court will not interfere with the City's exercise of discretion by second-guessing its judgment. See Housing Fin. Auth. of Pinellas County, 506 So.2d at 399; see also State ex rel. Wilcox v. T.O.L., Inc., 206 So.2d 69, 72 (Fla. 4th DCA 1968) ("When [the county commissioners'] plans do not exceed lawful authority they should be upheld since the courts have nothing to do with discretionary matters and will not on review substitute their judgment for that of the respective boards."). Indeed, "[w]e are charged only with gauging the legality of the undertaking though conceivably a project might be as ill-advised as it is legal." City of Miami v. Florida Dev. Comm'n, 165 So.2d 170, 171 (Fla.1964). Certainly, the City was entitled to rely upon the engineering report in determining the parameters of the project, despite the traffic study's competing recommendations. Therefore, the evidence was insufficient to overcome the presumption of validity accorded legislative findings.
Although Boschen asserts a credible argument regarding the specified purpose for the projectseveral documents mention economic redevelopment and improving quality of life at the beach area as objectivesthe evidence also suggested otherwise. Indeed, the testimony of the public works administrator indicated that the project was primarily concerned with transportation and economic development was a secondary benefit. The public works administrator further testified that every element of the project was directed toward creating a total design concept to facilitate pedestrian and vehicle movement. This testimony is buttressed by the engineering report, which identifies as objectives improving the bicycle circulation system and creating more parking opportunities.
To be sure, the evidence indicates that both economic development and public health and safety were identifiable goals. However, in DeSha v. City of Waldo, 444 So.2d 16, 18 (Fla.1984), we rejected the argument that a project promoted growth and development "because the question of the need for expansion and improvement of [the City's] water and sewer system is a *968 matter to be determined by the governing body of that community." In a similar vein, we noted in Town of Medley v. State, 162 So.2d 257, 260 (Fla.1964), that even if the primary motivation for the proposed improvements was attracting private industry, there was "no showing that such facilities [would] be used for the sole benefit of any such industry or that the inhabitants of the Town [would] not enjoy the full benefits of the proposed improvements." Likewise, the City's consideration of economic development while simultaneously addressing transportation safety does not detract from the project's overall commitment to public health and safety. Indeed, courts have recognized the health and safety concerns inherent in regulating traffic congestion. See Welker v. State, 93 So.2d 591, 594 (Fla.1957); Gate City Garage, Inc. v. City of Jacksonville, 66 So.2d 653, 656-57 (Fla.1953); Garvin v. Baker, 59 So.2d 360, 362 (Fla.1952); Town of Bay Harbor Islands v. Driggs, 522 So.2d 912, 915 (Fla. 3d DCA 1988). Thus, we conclude there was sufficient evidence to support the trial court's determination that the project furthered public health and safety. See State v. Miami Beach Redevelopment Agency, 392 So.2d 875, 892 (Fla. 1980) ("Plainly, the trial court resolved conflicts in the evidence in favor of the redevelopment plan. The court's findings are adequately supported by competent, substantial evidence, and must be affirmed.").
Nevertheless, Boschen further emphasizes that over half of the actual construction cost is allocated to the construction of a fountain and landscaping, although the record is unclear as to the final cost allocation of the project. In Northern Palm Beach County, we upheld the validity of bonds that were issued to provide roadway improvements in a private development. See 640 So.2d at 442-43. Over half of the bond issue was allocated for landscaping to provide a Caribbean motif. See id. at 444 (Shaw, J., dissenting). In the present case, testimony indicated that the landscaping of the roundabout would be used to slow traffic, thereby reducing pedestrian accidents. Moreover, the City relied upon the Florida Department of Transportation Guide, which provides that landscaping must be designed to optimize safety and operation of the roundabout and should consider several safety concerns, including: maintaining minimum stopping and turning sight distances; maintaining minimum horizontal clearance and clear zone requirements; ensuring visibility of signs and other vehicles; and discouraging pedestrian traffic through the center island. Furthermore, the City determined that the roundabout design would improve air quality by generating less pollution and consuming less fuel than the equivalent-volume signalized intersections. Thus, the landscaping does not only beautify, but also preserves public health and safety. Although the fountain expense, $2.1 million, is for aesthetic purposes, it cannot be separated from the overall project. It is interesting to note, however, that even the circulation of the water was selected based on the safety of motorists. In short, the roadway improvements are part of an integrated project, and there is substantial evidence in the record which demonstrates that the overall project promotes public health and safety.
In sum, we recognize that conflicting evidence was presented on the issue of whether the project promotes public health and safety. At the same time, however, we are also mindful of our limited inquiry in bond validation proceedings. We are not in a position to reweigh the evidence, but must solely determine whether competent, substantial evidence supported the City's decision. We conclude that it did. Accordingly, we affirm the bond validation judgment.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD and PARIENTE, JJ., concur.
LEWIS, J., concurs in result only.
NOTES
[1] Article VII, section 12, provides:

Counties, school districts, municipalities, special districts and local governmental bodies with taxing powers may issue bonds, certificates of indebtedness or any form of tax anticipation certificates, payable from ad valorem taxation and maturing more than twelve months after issuance only:
(a) to finance or refinance capital projects authorized by law and only when approved by vote of the electors who are owners of freeholds therein not wholly exempt from taxation; or
(b) to refund outstanding bonds and interest and redemption premium thereon at a lower net average interest cost rate. Art. VII, § 12, Fla. Const.
[2] Although similar, municipalities faced fewer constraints because they were often-times created by special acts of the Legislature. Courts construed these special acts as authorizing the financing of projects for broad municipal purposes. See State v. City of Miami, 76 So.2d 294 (Fla.1954); State v. City of Pompano Beach, 47 So.2d 515 (Fla.1950).
[3] Article I, section 1.01(a), of the Charter provides that the City "may exercise any power for municipal purposes except when expressly prohibited by law. In addition to the powers enumerated herein, the city shall be vested with all powers granted by general or special acts of the Legislature of the State of Florida and otherwise provided by law." Charter art. I, § 1.01(a). Further, subsection (c) provides that "[t]he powers of the city under this charter shall be construed liberally in favor of the city. The city is empowered to do whatever is necessary and proper for the safety, health, convenience and general welfare of its inhabitants." Id. art. I, § 1.01(c).