PER CURIAM.
Terry Sue Turner appeals a circuit court judgment validating a proposed bond issue. We have jurisdiction. See art. V, § 3(b)(2), Fla. Const. For the reasons set forth below, we affirm the bond validation judgment.
BACKGROUND
In May 1996, the City Commission of Clearwater adopted Resolution 96-38, determining the necessity to replace the existing Memorial Causeway Bridge. See City of Clearwater, Pinellas County, Fla., Resolution 96-38 (May 2, 1996). Therein, the City Commission recognized that the Memorial Causeway Bridge serves as the evacuation route for the north end of Sand Key, all of Clearwater Beach and Island Estates; the bridge is one of the top ten accident sites within the City; the bridge is deficient under current design standards; and the number of bridge openings exhibits the highest average annual daily traffic of any four-lane drawspan bridge along the entire west coast of Florida. See id. The City stated that a new four-lane, high-level fixed bridge built to current state standards would eliminate most of the problems associated with the existing bridge. See id. Accordingly, the City Commission concluded that the replacement of the Memorial Causeway Bridge was of the highest priority to the City of Clearwater and authorized city officials to take the necessary steps to obtain funding from the state for its replacement. See id. §§ 1-2. On the same day, the City Commission also adopted Resolution 96-39, requesting congressional representatives to assist the City in obtaining federal funding to replace the bridge. See City of Clear-water, Pinellas County, Fla., Resolution 96-39 (May 2,1996).
Thereafter, on June 19, 1997, the City Commission adopted Resolution 97-41, authorizing the execution of a Joint Participation Agreement between the City and the Florida Department of Transportation to construct a new Memorial Causeway Bridge. See City of Clearwater, Pinellas County, Fla., Resolution 97-41 § 1 (June 19, 1997). Pursuant to this authority, the City and the Florida Department of Transportation entered into a Joint Participation Agreement on June 27, 1997, for the design, right-of-way acquisition and construction of a replacement bridge. See Joint Participation Agreement Between Florida Department of Transportation and the City of Clearwater (June 27, 1997) (hereinafter Joint Participation Agreement). Under the Joint Participation Agreement, the City will advance the funds for the project and the Florida Department of Transportation will reimburse the City up to $13 million.
*276 Pursuant to article IX of the City’s Charter, which requires the City to provide fiscal aspects of bond issuances by ordinance, the City enacted Ordinance No. 6352-99 on May 6, 1999, authorizing the issuance of Infrastructure Sales Tax Revenue Bonds, Series [to be determined], to finance the cost of capital improvements in Clearwater. See City of Clearwater, Pi-nellas County, Fla., Ordinance 6352-99 § 3 (May 6, 1999) (hereinafter Bond Ordinance). The Bond Ordinance specifies that the sole source of repayment of the bonds is derived from the City’s infrastructure sales tax revenues. See Bond Ordinance § 3(B). These revenues are generated pursuant to an interlocal agreement with Pinellas County and other participating municipalities regarding the distribution of the additional infrastructure sales tax revenues collected by Pinellas County. See id. § 2 (defining “Sales Tax Revenues”). The Bond Ordinance further provides that the City shall never be required to levy ad valorem taxes to fund repayment of the bonds. See id. § 3(D).
On June 1, 2000, the City adopted Resolution 00-19, providing for the sale of Infrastructure Sales Tax Revenue Bonds, Series 2000, not to exceed $51,000,000. See City of Clearwater, Pinellas County, Fla., Resolution 00-19 (June 1, 2000) (hereinafter Resolution 00-19). In its legislative findings, the City concluded that the Series 2000 project, consisting of the right-of-way acquisition, planning and construction of a replacement bridge, was necessary for the continued health and safety of the citizens of Clearwater and that the financing thereof with proceeds of the Series 2000 Bonds was in furtherance of public health and safety.[1] See Resolution 00-19 § 1(C). Under article IX of the City’s Charter, revenue bonds for projects in excess of $1 million must be approved by public referendum. See City of Clear-water, Pinellas County, Fla., Charter art. IX (March 9, 1999) (hereinafter Charter). An exception to the referendum requirement is provided, however, for revenue bonds issued for “public health, safety or industrial development and revenue bonds for refunding.” Id. The City did not hold a public referendum for the issuance of the Series 2000 bonds.
The City filed a complaint for bond validation with the Sixth Judicial Circuit Court in Pinellas County on June 8, 2000. Terry Sue Turner intervened and filed an answer contesting the City’s authority to issue the bonds without a public referendum. Following a hearing, the circuit court entered its final judgment finding the City was authorized to issue bonds for the bridge project without public referendum. This appeal followed.
ANALYSIS
The scope of this Court’s review in bond validation cases is limited to the following issues: (1) whether the public body has the authority to issue the bonds; (2) whether the purpose of the obligation is legal; and (3) whether the bond issuance complies with requirements of the law. See State v. Osceola County, 752 So.2d 530, 533 (Fla.1999); Poe v. Hillsborough County, 695 So.2d 672, 675 (Fla.1997). A final judgment validating bonds comes to this Court with a presumption of correctness. See Wohl v. State, 480 So.2d 639, 641 (Fla.1985). The appellant has the burden of demonstrating that the record and evi- *277 denee fail to support the lower court’s conclusions. See id.
The second and third prongs, i.e., the legality of the bond purpose and compliance with bond issuance requirements, are not at issue in this case. Turner acknowledges that a valid municipal purpose exists. Indeed, this Court has recognized that road construction is a valid public purpose for which bonds may be issued.[2] See Northern Palm Beach County Water Control Dist. v. State, 604 So.2d 440, 443 (Fla.1992); Washington Shores Homeowners’ Ass’n v. City of Orlando, 602 So.2d 1300, 1301 n. 2 (Fla.1992). Further, the City followed the procedures for validating bonds set forth in chapter 75, Florida Statutes (1999). The City enacted an ordinance authorizing the issuance of bonds, adopted a resolution approving the bridge project, and filed a complaint for validation in circuit court, which properly joined the state, taxpayers, property owners, and citizens of Clearwater. In accordance with section 75.04, the complaint alleged the City’s authority to issue the bonds, the ordinance and resolution authorizing the issuance of bonds, the amount of the bonds, and the interest the bonds will bear. Thus, the City complied with the requirements of chapter 75 in seeking to issue and validate the bonds. See Osceola County, 752 So.2d at 540 (holding that county, which followed the same course of action, had satisfied requirements of chapter 75 and was not required to do anything more).
Although Turner challenges the City’s authority to issue bonds for the proposed project without prior referendum approval, there is generally ample authority for the City’s issuance of bonds to finance capital improvements. First, article VII, section 12, Florida Constitution, authorizes municipalities to issue bonds to finance capital projects, although a referendum is required when the bonds are payable from ad valorem taxation. See art. VII, § 12, Fla. Const.[3] In the case presented, the funds for repayment of the bonds are derived solely from infrastructure sales tax revenues and do not include ad valorem taxes.[4] Thus, the City’s issuance of the bonds does not trigger the state constitutional referendum requirement. See, e.g., State v. Sarasota County, 549 So.2d 659, 660 (Fla.1989). Second, article VIII, section 2, Florida Constitution, has been construed as giving municipalities broad home rule powers, providing that municipalities “may exercise any power for municipal purposes except as provided by law.” Art. VIII, § 2(b), Fla. Const.; see State v. City of Sunrise, 354 So.2d 1206, 1209 (Fla.1978). Pursuant to this constitutional provision, the Legislature enacted the Municipal Home Rule Powers Act, codified in chapter 166, Flori *278 da Statutes, which provides that municipalities shall have full authority to issue bonds. See §§ 166.021, 166.111(1), 166.141, Fla. Stat. (1999); see also Washington Shores, 602 So.2d at 1302 n. 2. The Charter similarly vests the City with broad authority. See Charter art. I, § 1.01, art. IX. Moreover, the City’s Bond Ordinance specifically authorizes the issuance of the bonds to finance the costs of capital improvements in Clearwater. See Bond Ordinance § 3.
As previously mentioned, however, article IX of the City’s Charter requires that “revenue bonds for projects in excess of one million dollars be put to referendum with the exception of revenue bonds for public health, safety or industrial development and revenue bonds for refunding.” Charter art. IX. Turner maintains that the public health and safety exception to the Charter’s referendum requirement includes only essential governmental functions. This Court, however, recently rejected this argument in Boschen v. City of Clearwater, 777 So.2d 958, 26 Fla. L. Weekly S32 (Fla. Jan. 18, 2001). In so doing, this Court recognized its previous decision in State v. County of Dade, 234 So.2d 651 (Fla.1970), wherein it abandoned the essential governmental function doctrine as the test for determining when referendum approval was required. See Boschen, 777 So.2d at 964; see also State v. School Board of Sarasota County, 561 So.2d 549, 553 (Fla.1990) (declining to reinstate the essential governmental function referendum exception which was rejected in State v. County of Dade). More importantly, this Court in Boschen rejected the argument that the Charter’s public health and safety exception reinstated the essential governmental function doctrine in Clearwater. Specifically, this Court stated:
Nevertheless, Boschen contends the Charter’s public health and safety exception reinstated the older doctrine in Clearwater. This argument is wholly devoid of merit. First, the plain language of the Charter does not support this interpretation. By using the words “public health, safety or industrial development,” the Charter refers to situations that could reasonably be construed as falling within the ambit of those categories. To be sure, the stipulation that the bond obligation must preserve public health and safety indicates a more narrow objective than routine municipal purposes. But given the absence of any explicit reference to the essential governmental function doctrine, the language cannot reasonably be construed as resurrecting this stringent exception to the former constitutional referendum requirement. Second, contrary to Bos-chen’s contentions, the citizens of Clear-water did not expressly retain this exception merely by voting not to repeal article IX of the Charter in March 1999. Indeed, the ballot for that election merely crossed out current article IX and inquired whether voters would support its repeal. Although voters elected to maintain article IX, they did not vary its express terms. Therefore, voter retention of article IX in no way suggests that the electorate also intended to incorporate the essential governmental function doctrine. Third, our express repudiation of this stringent restriction is further evidence that the Charter should not be interpreted as reinstating the doctrine. Fourth, the rationale of the doctrine is no longer applicable. It was created at a time when local governments had little authority to finance important government projects without prior referendum approval. In recent years, local governments’ authority to issue bonds has increased significantly. See generally art. VII, § 2, Fla. Const. *279 Moreover, the doctrine itself is unduly restrictive, in part because it struck a balance between the need for essential governmental operations and the duty to follow the former constitutional provision, which expressly imposed referendum requirements on local government spending in most circumstances. Thus, given the historical underpinnings of the doctrine, it is imprudent to construe the Charter as incorporating this stringent exception, especially without any credible evidence indicating such an intent. To be sure, the City could elect to limit its authority further by including more stringent requirements in the charter. However, there is no evidence to indicate that it did so. On the contrary, the Charter vests the City with broad governing authority. In short, the exception to the referendum requirement refers only to bond obligations that improve “public health, safety and industrial development,” and this term should not be construed as the equivalent of essential governmental functions.
Boschen, 777 So.2d at 965-66 (footnote omitted).
Notwithstanding our conclusion as to the Charter, this Court must also determine -whether the evidence presented during the validation proceeding supported the trial court’s validation of the bonds. Turner alleges that the evidence failed to establish that the bridge project was an essential governmental function. Rather, Turner contends that the evidence revealed the primary purpose of the bridge project is to provide a focal point for tourists and residents traveling between Clear-water Beach and downtown, to act as a signature piece entrance to Clearwater Beach and the downtown business district, and to cure some functional obsolescence with the existing bridge. By contrast, the City maintains that there was ample evidence to support the legislative determination that the bridge project furthered public health and safety. Moreover, the City asserts that the testimony of the City’s public works administrator demonstrated the relationship between the project and the City’s public health and safety concerns.
As noted previously, the City in Resolution 00-19 found that the bridge project was necessary for the continued health and safety of the citizens of Clear-water and that financing the project with the bonds at issue was in furtherance of public health and safety. See Resolution 00-19 § 1(C). Although these legislative expressions of public purpose are not controlling, they are entitled to great weight. See Northern Palm Beach County Water Control Dist., 604 So.2d at 442; State v. Leon County, 400 So.2d 949, 951 (Fla.1981). The record in this case demonstrates that these findings are not clearly erroneous. Indeed, the City considered numerous public health and safety issues in evaluating the proposed bridge project including accident rates, pedestrian and bicyclist safety, air pollution, and the need for an efficient evacuation route.
At the validation proceeding below, the City’s public works administrator, Mahshid Arasteh, testified regarding the necessity and purpose of the proposed bridge project, as well as the numerous health and safety concerns surrounding the existing bridge.[5] Arasteh stated that although not structurally obsolete, the existing bridge is functionally obsolete. Arasteh noted that *280 the existing bridge has ten-foot wide lanes, lacks a barrier between pedestrians and the traffic lanes, and lacks a shoulder. Further, the existing bridge is one of the top ten accident sites in the City and its level of service is ranked “F.” According to Arasteh, the increased air pollution generated by traffic backups on the existing bridge as a result of the frequent bridge openings was also a concern. Moreover, Arasteh reiterated that the bridge serves as the main evacuation route for the north end of Sand Key, all of Clearwater Beach and Island Estates and that safety issues concerning evacuation were a major factor.
Arasteh dismissed the assertion that public health and safety concerns were not the primary reason for replacing the existing bridge, stating that “the Commission has been very specific to take a bridge to them that is a bridge that is for health and safety of the residents of Clearwater, number one.” In contrast to the existing bridge, the replacement high-span bridge will not require any openings and will be built to current state standards with safety shoulders, a raised separator between pedestrian and vehicular traffic, and adequate sidewalk width for pedestrians and bicyclists. Indeed, Arasteh noted that the types of accidents which have occurred on the existing bridge were factored into the design of the replacement bridge to help avoid those types accidents in the future.
Notwithstanding the evidence relating to public safety discussed above, Turner alleges additional evidence demonstrated that the bridge project is motivated by concerns other than public health and safety. For instance, Turner asserts that the Joint Participation Agreement provides the new bridge will be a focal point to tourists and residents who travel between Clearwater Beach and the redeveloped downtown area. Likewise, Turner notes that both the Joint Participation Agreement and Interlocal Agreement recognize the replacement bridge will act as a signature piece entrance to Clearwater Beach and the downtown business district. However, the Joint Participation Agreement also states that the project is necessary and in the best interests of the citizens of the State of Florida. See Joint Participation Agreement, ¶ 16. Further, the Interlocal Agreement recognizes that the existing bridge needs to be replaced to “optimize traffic flow.” Thus, despite Turner’s contention, there was competent substantial evidence to support the trial court’s determination that the project furthered public health and safety within the meaning of Article IX of the City’s Charter. Similarly, Turner’s contention that the trial court’s ruling created an implied exception to the referendum requirements of the Charter by allowing revenue bonds to be issued for advance funding of a state project is without merit.
Turner also argues that there is no evidence in the record to support the trial court’s finding and discussion of the terms “development” and “city facility.” The trial court found as follows:
EIGHTH. That the Series 2000 Project, consisting of the construction of a new Memorial Causeway Bridge to replace the existing draw bridge is necessary and in the interests of the public health and safety of the citizens of the City, that Section 2.01(d) of the City Charter does not require that the City obtain prior referendum approval before the City undertakes the Series 2000 Project in that such Series 2000 Project is not “development” within the meaning of Section 2.01(d)(6) of the Charter and that Sections 2.01(d)(5)(v) and 2.01(d)(7) of the City’s Charter, when read together, permit the City to grant the necessary rights of way for the Series 2000 Project. That this holding is consistent *281 with this Court’s determination in Spatuzzi, et al. v. City of Clearwater, Case No. 99-1080-CI-21. In reaching this conclusion, the Court specifically finds that [the] Series 2000 Project is a part of the City’s street system and thus constitutes a “city facility” within the meaning of the City’s Charter, that the Series 2000 Project is necessary and in the interest of the public health, safety and welfare of the citizens of the City, that the existing bridge is one of the top ten accident locations in the City and is deficient under current design standards, and that the City has concluded that the Series 2000 Project will cure the deficiencies of the existing bridge.
City of Clearwater v. State, No. 00-4060-CI-021 (Fla. 6th Cir.Ct. Sept. 26, 2000).
Turner maintains that no testimony adduced or evidence admitted during the proceeding was relevant to defining the term “development” as it pertains to the Charter. This argument, however, ignores the trial court’s previous determination in Spatuzzi v. City of Clearwater, No. 99-1080-CI-21 (Fla. 6th Cir.Ct. Jan. 26, 2000), that the bridge project the City sought to have bonds validated for in the proceeding below did not constitute “development” within the meaning of section 2.01(d)(6) of the City’s Charter. The plaintiffs in Spa-tuzzi alleged that the bridge project constituted development under section 2.01(d)(6) of the City’s Charter and hence, must be approved by public referendum.[6] The trial court rejected the plaintiffs’ argument, concluding that the bridge project was not development as contemplated under section 2.01(d)(6). See id. at 5. The Second District subsequently affirmed the trial court’s decision without written opinion. See Spatuzzi v. City of Clearwater, No. 2D00-1482 (Fla. 2d DCA Dec.1, 2000). Significantly, the trial court’s decision in Spatuzzi involved the bridge project that was the subject of the validation proceeding below. As such, the trial court’s legal conclusion that the bridge project was not “development” under section 2.01(d)(6) was binding on the City, as well as the trial court.
Nonetheless, Turner asserts that the City never made a request that the trial court take judicial notice of Spatuzzi under section 90.202(6), which provides that a court may take judicial notice of records of any court. See § 90.202(6), Fla. Stat. (1999). As a result, Turner maintains the trial court’s decision in Spatuzzi cannot serve as the basis for a finding in the decision below. Section 90.201, however, provides that a court shall take judicial notice of decisional law. See § 90.201(1), Fla. Stat. (1999); see also Charles W. Eh-rhardt, Florida Evidence § 201.2 (1999 ed.) (noting that decisions of the Florida courts must be judicially noticed). Thus, *282 Turner’s argument as to the trial court’s reliance on its earlier decision in Spatuzzi is without merit.
As noted above, Turner also asserts that there is no evidence in the record to support the trial court’s finding that the bridge project constitutes a “city facility” within the meaning of section 2.01(d)(7) of the City’s Charter.[7] Rather, Turner contends that the evidence demonstrated the project is in fact a “state facility.” Indeed, the public works administrator acknowledged that the bridge is a Department of Transportation roadway and is a state facility. Similarly, the Joint Participation Agreement provides that the project is located “on a State facility.” Joint Participation Agreement, ¶ 16.
The City acknowledged during the proceeding below that the real property on which the bridge project will be located, as well as certain access roads, are lands described in section 2.01(d)(7) of the Charter. Notwithstanding this fact, the City asserted that the bridge project was exempt from the referendum requirement of section 2.01(d)(7). Although the bridge project and certain of the access roads constitute a portion of State Road 60, the City argued that they also form a part of the City’s integrated street system and thus constitute “city facilities.” Relying on Welker v. State, 93 So.2d 591 (Fla.1957), the City maintained that in facilitating the transportation needs of City residents, the bridge and associated roadways will clearly be city facilities, notwithstanding the fact that title to the bridge may also vest in the State Department of Transportation.
In Welker, a taxpayer sought reversal of a trial court’s order validating excise tax improvement bonds that the City of Fort Lauderdale sought to issue for the construction of an off-street parking lot, a police station, and three bridges. See id. at 593. In addressing the taxpayer’s contention that the city was using the bond proceeds to improve a state highway, inasmuch as one of the bridges sought to be built was on a road designated as a “municipal connecting link road” in the state highway system, this Court stated:
We judicially know that many municipal streets in Florida constitute component parts of the state highway system to the extent that traffic entering the city on a state highway is channeled through the municipality in connecting state highways at other points on the municipal limits. It may be that this boulevard is a part of the state highway system. It is, however, at the same time, according to this record, an essential artery of travel serving the people of the municipality. As to whether municipal funds should be expended for this particular improvement in the interest of the people of the city is a matter of local concern to be settled by the city officials in their wisdom. It is not a diversion of municipal funds to a nonmunicipal pur *283 pose. It is not a problem for this Court to resolve.
Id. at 594-95; see also Lewis v. Leon County, 91 Fla. 118, 107 So. 146, 152 (1926) (“It may be a state road, both in name and in ownership, but as to that portion which passes through a particular county it is also, to all intents and purposes, and in its beneficent effect, a county road as well.”).
This Court has recognized that the primary purpose of building roads and bridges is to serve the general public. See State v. Florida State Improvement Comm’n, 75 So.2d 1, 4 (Fla.1954). Indeed, the bridge project at issue in this case will promote the transportation needs of the City’s residents and visitors. Moreover, the trial court was well aware of the location of the bridge and its relation to the City. For example, evidence was presented during the validation proceeding below that the bridge connects the downtown and beach areas, an average of 38,000 vehicles traverse the bridge daily, the bridge is the primary and sole evacuation route for several beach areas, and the eastern end of the replacement bridge will follow the alignment of Pierce Boulevard and tie into the Court/Chestnut Streets one-way pair, with an additional connection to downtown in the vicinity of Pierce Street. Thus, despite some evidence denoting the project as a state facility, the trial court’s reasoning and finding that the bridge project “is a part of the City’s street system and thus constitutes a ‘city facility’ within the meaning of the City’s Charter” is supported by the record.
Lastly, Turner contends that there is no legislative authority for the City to provide funding for a State project by way of bond issuance. We disagree. As previously discussed, the City and the Florida Department of Transportation entered into a Joint Participation Agreement, pursuant to section 339.12, Florida Statutes (Supp. 1996), and section 339.121, Florida Statutes (1995), for the design, right of way acquisition and construction of a replacement bridge. At the time the Joint Participation Agreement was entered, section 339.12 provided, in pertinent part, that:
(1) Any governmental entity may aid in any project or project phase, including, but not limited to, preliminary engineering, design, acquisition of rights-of-way, construction, or maintenance of any road on the State Highway System, by contributions to the department of cash, bond proceeds, time warrants, or other goods or services of value.
[[Image here]]
(4)(c) The department is authorized to enter into agreements under this subsection for a project or project phase not included in the adopted work program. The project or project phase must be a high priority of the governmental entity. Reimbursement for a project or project phase must be made from funds appropriated by the Legislature pursuant to s. 339.135(5). All other provisions of this subsection apply to agreements entered into under this paragraph. At no time shall the total amount of project agreements for projects or project phases not included in the adopted work program exceed $50 million.
§ 339.12, Fla. Stat. (Supp.1996) (emphasis added).[8] Indeed, subsection (4)(e), as *284 quoted above, was incorporated into the Joint Participation Agreement. See Joint Participation Agreement, ¶ 12. Further, section 339.121(1) provided:
A governmental entity may also aid in right-of-way, capital acquisition, construction, or construction-related expenses of any public transportation project. Such aid may be in the form of cash, bond proceeds, time warrants, or goods and services. By specific provisions in a written agreement between the department and the governmental entity, the department may agree to reimburse the governmental entity for the full amount of the cash, bond proceeds, time warrants, and/or direct goods and services provided for use on a project or project phase that is contained in the department’s adopted work program. Reimbursement to the governmental entity for such project or project phase must be made from funds appropriated by the Legislature, and reimbursement for the entire amount of the cash, bond proceeds, time warrants, or direct cost of goods and services provided for the project or project phase is to begin in the year the project or project phase is scheduled in the adopted work program.
§ 339.121, Fla. Stat. (1995).[9] Accordingly, we find the City is authorized to use bond proceeds to provide advanced funding for the construction of the bridge project to be undertaken by the Florida Department of Transportation. See § 339.12, Fla. Stat. (Supp.1996); see also Lewis, 107 So. at 154 (holding that county had power under statute to authorize issuance of bonds to contribute to, or aid in, the construction of a public road located in and benefitting the county, although when constructed it was to be owned and maintained by the state).
Based upon the foregoing, we affirm the final judgment of the circuit court validating the issuance of the Series 2000 bonds.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.

. Prior to adopting Resolution 00-19, the City entered into an interlocal agreement with Pinellas County under which the county intends to provide $10 million of funding to the City to assist with the direct expenditures for the bridge project. See Interlocal Agreement Between Pinellas County and the City of Clearwater for Memorial Causeway Bridge Replacement (April 7, 2000) (hereinafter In-terlocal Agreement).

. As defined in the Florida Transportation Code, the term "road” includes bridges. See § 334.03(23), Fla. Stat. (1999).

. Article VII, section 12, provides:
Counties, school districts, municipalities, special districts and local governmental bodies with taxing powers may issue bonds, certificates of indebtedness or any form of tax anticipation certificates, payable from ad valorem taxation and maturing more than twelve months after issuance only:
(a) to finance or refinance capital projects authorized by law and only when approved by vote of the electors who are owners of freeholds therein not wholly exempt from taxation; or
(b) to refund outstanding bonds and interest and redemption premium thereon at a lower net average interest cost rate.
Art. VII, § 12, Fla. Const.

.The City's chief financial officer, Margaret Simmons, testified during the validation proceeding below that the City's share of the infrastructure sales tax revenues is adequate to fund repayment of the Series 2000 bonds.

. According to Arasteh, the Public Works Administration and the Florida Department of Transportation have held approximately thirty public meetings concerning the project since 1995, including seven before the City Commission where presentations were made by consultants and the public works staff.

. Section 2.01(d)(6) of the City's Charter provides:
No municipal or other public real property-lying west of Osceola Avenue, east of Clear-water Harbor between Drew and Chestnut Streets, being further described as: [legal description omitted], and no municipal or other public real property constituting the Memorial Causeway or lands immediately contiguous thereto, more particularly described as: [legal description omitted], shall be developed or maintained other than as open space and public utilities together with associated appurtenances, except upon a finding by the commission at a duly advertised public hearing that such development is necessary in the interest of the public health, safety and welfare of the citizens of the city and approval of such finding at referendum, conducted subsequent to the public hearing. City-owned tennis courts and associated appurtenances may be constructed and maintained on such property south of Cleveland Street.
Charter art. II, § 2.01(d)(6) (emphasis added). The Charter does not define the terms "developed” or "maintained.”

. Section 2.01(d)(7) provides:
No city owned real property in the area bounded on the north by Drew Street, on the east by Osceola Avenue, on the south by Pierce Street, and on the west by the waters of Clearwater Harbor, shall be sold, donated, leased, or otherwise transferred or used for other than city facilities except upon a finding by the commission at a duly advertised public hearing that such transfer or use is necessary and in the interest of the public health, safety and welfare of the citizens of the city and the approval of such finding at referendum....
Charter art. II, § 2.01(d)(7) (emphasis added). Notably, the term "city facilities" is not defined in the City's Charter. The term "facilities,” however, has been defined as follows: "That which promotes the ease of any action, operation, transaction, or course of conduct.” Black’s Law Dictionary 591 (6th ed.1990).

. Section 339.12 has subsequently been amended. See ch. 97-280, § 23, Laws of Fla.; ch. 99-218, § 20, Laws of Fla.; ch.2000-257, § 15, Laws of Fla. As amended, section 339.12, provides, in pertinent part, as follows:
(1) Any governmental entity may aid in any project or project phase included in the adopted work program by contributions to the department of cash, bond proceeds, time warrants, or other goods or services value.
*284 [[Image here]]
(4)(c) The department may enter into agreements under this subsection for a project or project phase not included in the adopted work program. As used in this paragraph, the term "project phase” means acquisition of rights-of-way, construction, construction inspection, and related support phases. The project or project phase must be a high priority of the governmental entity. Reimbursement for a project or project phase must be made from funds appropriated by the Legislature pursuant to s. 339.135(5). All other provisions of this subsection apply to agreements entered into under this paragraph. The total amount of project agreements for projects or project phases not included in the adopted work program may not at any lime exceed $100 million.
§ 339.12, Fla. Stat. (2000).

. Section 339.121 has since been repealed. See ch. 97-280, § 35, Laws of Fla.